849 A.2d 1166

**GENERAL ELECTRIC COMPANY, Appellant**

v.

**WORKERS' COMPENSATION APPEAL BOARD (MYERS), Appellees.**

Supreme Court of Pennsylvania.

Argued March 3, 2003.

Decided May 27, 2004.

Donald F. Fessler, Jr., Erie, for General Electric Company.

Amber Marie Kenger, Richard C. Lengler, Mechanicsburg, for Workers' Compensation Appeal Board.

Lisa J. Buday, Washington, Joseph Scott Leckie, for James Myers.

Samuel H. Pond, Philadelphia, for Pennsylvania Trial Lawyers Association.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, LAMB, JJ.

### *OPINION ANNOUNCING THE JUDGMENT OF THE COURT*

Justice NIGRO.

We granted allowance of appeal in this workers' compensation case to decide whether the workers' compensation judge ("WCJ") properly found that a light-duty position offered to

James Myers ("Claimant") was a temporary position and if so, whether the WCJ properly modified Claimant's benefits only for that period of time that the position was available. We affirm the WCJ's decision in both respects.

On September 21, 1995, Claimant injured his head while working for Appellant General Electric Company ("Employer") as a welder and an assembler.[1] Employer subsequently issued a notice of compensation payable, acknowledging Claimant's injury and agreeing to pay him total disability benefits of $509.00 per week. Claimant eventually returned to work with Employer in a light-duty position and his benefits were suspended. *See* Meyers Dep., 4/20/1998, at 5–6. In April 1996, however, Claimant was laid off from that position and his total disability benefits were reinstated. *See id.*

On November 13, 1997, Employer filed a petition to modify Claimant's benefits, alleging that he had acted in bad faith in failing to follow through with several referrals to open jobs within his medical limitations. After Claimant filed an answer denying Employer's allegations, however, Employer amended its petition to allege only that Claimant had acted in bad faith in refusing two specific job offers, both of which were with a telemarketing company called Smart Telecommunications, Inc. ("Smart"). In support of its petition, Employer presented the deposition testimony of (1) Janet Winschel, the general manager of Expediter Corporation ("Expediter"), an employment consulting firm that Employer's insurance carrier hired to find Claimant a job; (2) Stacey Marchione, the owner and president of Smart; and (3) two doctors who had examined Claimant.

According to the testimony of Ms. Winschel and Ms. Marchione, Smart interviewed Claimant on July 24, 1997, and thereafter offered him a position as a customer service surveyor for forty hours a week at a rate of $9.00 per hour. In that position, Claimant would be required to contact various businesses by telephone to verify their names and addresses so that Smart's clients could send the businesses information about products. Claimant was expected to work in his home,

---

1. Claimant was struck by an 85 pound door hanging from a crane.

but Employer's insurance carrier would provide for all of his necessary equipment as well as training.[2]  Significantly, three separate doctors had examined Claimant on Employer's behalf and all had approved the position as within Claimant's medical capabilities.

A short time after he received the offer, however, Claimant informed Smart that he could not work in his home because he lived in an area zoned for agricultural use only.[3]  Thereafter, Ms. Winschel notified Claimant that office space had been rented for him to perform the surveyor position and that training would begin on August 15, 1997.  In spite of the resolution of this issue, on the day before the training was to begin, Claimant notified Ms. Winschel that he was declining the Smart position based on his family doctor's advice.  Two months later, Employer sought an independent medical examination of Claimant, following which the examining doctor concluded that Claimant was medically capable of performing the Smart position.  Expediter therefore re-offered Claimant the surveyor position on Smart's behalf.  Nevertheless, Claimant declined the position again.

On cross-examination at their depositions, both Ms. Winschel and Ms. Marchione revealed that the surveyor position was to have been fully subsidized by Employer's insurance carrier.  *See* Winschel Dep., 2/12/98, at 76–77;  Marchione Dep., 4/29/98, at 34.  That is, Employer's insurance carrier was to have paid for all of Claimant's wages, insurance, taxes, equipment, and training, as well as for the rent on the facility where he would have worked.[1]  *See* Winschel Dep., at 47, 77, 88;  Marchione Dep., at 34, 43, 76, 89, 99.  However, both Ms.

---

**2.**  Claimant would be provided with a remote control headset, with which he could make telephone calls while sitting, standing, or walking. Furthermore, Claimant could obtain dictation equipment if he had trouble completing the paperwork required for the job.

**3.**  Indeed, a zoning officer verified that Claimant needed the zoning hearing board's approval before he could perform the Smart position in his home.  *See* Winschel Dep., at 47 (explaining that zoning officer had told an Expediter employee that Claimant would need to pay a fee and attend a hearing to obtain zoning hearing board's approval).

**4.**  At the time Smart offered Claimant the surveyor position, it employed a payroll service for its subsidized employees, but used its own payroll

Winschel and Ms. Marchione also testified that the subsidization period was limited in duration and typically lasted just ninety days or less.[5]

Ms. Marchione added that under the subsidization program, if subsidized employees meet Smart's productivity standards by the end of their subsidy periods, Smart will continue to employ them and will place them on its own payroll. *See* Marchione Dep., at 85–86; *see also* Winschel Dep. at 78 ("If they are productive employees they will be hired on Smart's employment payroll."). However, Ms. Marchione also acknowledged that when a formerly subsidized employee is officially placed on Smart's payroll, his job may change, his hours may be reduced, and his wages may decrease as the subsidy rate is higher than the rate at which Smart normally

system for its non-subsidized employees. *See* Marchione Dep., at 40–42. While Claimant would have received a paycheck from Smart's payroll service, Smart would have been paid for all of Claimant's wages and expenses by Expediter, which would have then been reimbursed by Employer's insurance carrier. *See* Winschel Dep., at 76–77; Marchione Dep., at 98–100.

5. Specifically, Ms. Winschel testified:

Q: Suppose Mr. Myers had agreed to accept this position with Smart Telecommunication, if he had done that and started to work for them, who would have paid him?
A: Initially his salary would have been subsidized by [Employer's insurance carrier]....

....

Q: And how long would that situation continue?
A: Commonly the subsidized pay goes up to five hundred hours or ninety days.
Q: Or ninety days?
A: Which is [sic] very similar.
Q: That's two ways of saying the same thing?
A: That's correct.

Winschel Dep., at 76–77. Similarly, Ms Marchione stated:

Q: When you say that the job is subsidized, to what extent?
A: 100 percent.
Q: For how long?
A: Indefinite period of time. Anywhere from a week to typically three months.

Marchione Dep., at 34–35.

pays its employees.[6,7] *See id.* at 85–86, 56–59. Ms. Marchione further conceded that the turnover rate for employees who worked at Smart based on Expediter referrals was "very high." *See id.* at 49–53. Indeed, according to Ms. Winschel, while Expediter had placed fifty-plus people at Smart since Smart was incorporated in September 1997, only about four of those people were officially hired by Smart at the end of the subsidy period.[8] *See* Winschel Dep. at 81–82.

Meanwhile, the two doctors who testified on behalf of Employer both opined that Claimant was capable of performing the surveyor position.[9] In defending his refusal to accept the position, Claimant offered his own testimony as well as the deposition testimony from three different doctors. Notably, Claimant testified that he thought that he could perform the surveyor position, but expressed a concern that he might have trouble with the writing component of the job. Claimant nevertheless stated that he refused the position based on his family doctor's recommendation. In fact, two of the doctors produced by Claimant, one of whom was his family doctor, testified that they did not believe that Claimant could perform

**6.** According to Ms. Marchione, non-subsidized employees in the surveyor position start at a base rate of $5.00 an hour, rather than $9.00 an hour, the subsidized rate offered to Claimant. *See* Marchione Dep., at 35, 46. However, Ms. Marchione also explained that employees could progress into telemarketing or sales positions where they could earn commissions and thereby increase their hourly rate. *See id.* at 45–46.

**7.** Ms. Marchione also testified that subsidized employees had to return their equipment to the employer's insurer at the end of the subsidy period, but Smart would provide any employee who stayed with new equipment. *See* Marchione Dep., at 90. Ms. Marchione did not specify whether Smart would pay to rent a facility where a non-subsidized employee could work. Nevertheless, it is doubtful that Smart would do so as Ms. Marchione made clear that *all* of Smart's current non-subsidized employees are home-based and that Smart has never arranged or paid for the office space obtained for subsidized employees. *See id.* at 75–78, 102–03.

**8.** Furthermore, it appears that two of those four left Smart shortly after being hired because Ms. Marchione testified that only two formerly subsidized employees still worked for Smart in April 1998. *See* Marchione Dep., at 49.

**9.** The doctors based their opinions on their own examinations of Claimant and their review of the surveyor position job description.

the surveyor position. On the other hand, the third doctor whose testimony Claimant offered opined that the position was within Claimant's medical limitations.

After reviewing all of the evidence, on June 14, 2000, the WCJ issued a decision granting Employer's modification petition in part and denying it in part. In particular, the WCJ determined that Claimant could perform the surveyor position offered to him and that his refusal of that position was improper.[10] Nevertheless, the WCJ also found that the position was only temporarily available to Claimant for ninety days. As she explained:

> [I]nasmuch as said position was a funded position, only guaranteed for a period of ninety (90) days, and there was no assurance or obligation on behalf of Smart Telecommunications, Inc. to hire the Claimant after the period of funding ran out, said job is found to only have been temporarily available to the Claimant for those ninety (90) days. In fact, under these circumstances, the Claimant's employer for this temporary position was, in fact, the date of injury Employer, who, through its agent, Expediter, created a job for the Claimant, by agreeing to pay the Claimant's wages and pay the cost of training the Claimant and renting the facility out of which the Claimant would have performed work for Smart Telecommunications, Inc. This is similar to the Employer having a short-term light-duty program.

WCJ Op., 6/14/00, at 11. The WCJ therefore ordered that Claimant's total disability benefits be modified to partial disability benefits pursuant to section 306(b) of the Workers' Compensation Act (the "Act"),[11] 77 P.S. § 512(1), to reflect his improper refusal of the surveyor position, but only for a period of ninety days. On appeal, the Workers' Compensation Appeal Board and the Commonwealth Court both affirmed the WCJ's decision.

10. The WCJ rejected the testimony from the two doctors who opined that Claimant was incapable of performing the Smart position. The WCJ also rejected Claimant's testimony that he did not accept the position based on his family doctor's recommendation. Instead, the WCJ found, based on testimony from the family doctor, that the doctor had provided Claimant with a letter expressing her disapproval of the position based on prompting from Claimant and his wife, and without examining Claimant.

11. Act of June 2, 1915, P.L. 736 (as amended, 77 P.S. §§ 1–1041.1).

Employer now argues that the WCJ erred in finding that the surveyor position offered to Claimant was only temporarily available solely because it was temporarily subsidized. In support of its argument, Employer cites to Ms. Winschel's and Ms. Marchione's testimony that Claimant could have continued to work for Smart at the end of the subsidy period if he met Smart's productivity requirements. Based on this testimony, Employer contends that the surveyor position was a continuous light-duty position and that Claimant, like any other employee-at-will, was guaranteed continued employment at Smart so long as he performed as expected. We disagree.

Employer's challenge to the WCJ's decision involves allegations both that the WCJ erred as a matter of law and that she made improper findings of fact. With regard to the WCJ's legal findings, our review is plenary. *Daniels v. Workers' Compensation Appeal Bd., (Tristate Transport)*, 574 Pa. 61, 828 A.2d 1043, 1046–47 (2003). On the other hand, with respect to the challenged findings of fact, it is well-established that the workers' compensation judge is the ultimate finder of fact and as such, she decides which witnesses are credible and how much weight should be placed on each piece of evidence. *See Bethenergy Mines, Inc. v. Workers' Compensation Appeal Bd. (Skirpan)*, 531 Pa. 287, 612 A.2d 434, 436 (1992). Given this broad fact-finding power, this Court may only disturb a workers' compensation judge's findings of fact if they are not based on substantial evidence. *see also* 2 Pa.C.S. § 704. Therefore, such findings must be upheld so long as they are based on an amount of " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " *Bethenergy Mines*, 612 A.2d at 437 (*quoting Republic Steel Corp. v. Workmen's Compensation Appeal Bd.*, 492 Pa. 1, 421 A.2d 1060, 1061(1980)).

Section 413 of the Act grants the workers' compensation judge the authority to "modify, reinstate, suspend, or terminate" a claimant's benefits "upon petition filed by either party with the department, upon proof that the disability of [the claimant] has increased, decreased, recurred, or has temporarily or finally ceased...." 77 P.S. § 772. In *Kachinski v.*

*Workers' Compensation Appeal Bd. (Vepco Construction Co.),* 516 Pa. 240, 532 A.2d 374 (1987) this Court clarified what was required for a claimant's total disability benefits to be reduced to partial disability benefits under section 413. In that regard, we explained that an employer must produce medical evidence that the claimant's injury has improved so that he has recovered some or all of his ability to work. *See id.* at 380. In addition, the employer must show that it referred the claimant to an available job within his medical limitations.[12] *See id.* We made clear that the referral must "be tailored to the claimant's abilities ... and be made in a good faith attempt to return the injured employee to productive employment, rather than a mere attempt to avoid paying compensation." *Id.* We directed that to meet this burden, an employer needs to "produce medical evidence describing the claimant's capabilities, and vocational evidence classifying the job, *e.g.,* whether it is light work, sedentary work, etc., along with a basic description of the job in question." *Id.* at 379. It is then up to a workers' compensation judge to determine whether the claimant can actually perform the job in question. *Id.*

Once an employer has met the above requirements, the burden falls on the claimant to demonstrate that he followed through with the employer's job referral in good faith. *See id.* at 380. If he did, but the referral nevertheless failed to result in a job offer, the claimant's benefits may not be modified.[13] *See id.* On the other hand, if the claimant failed to follow up on the referral without good cause, willfully sabotaged the interview, or refused a valid job offer, the

12. This Court has subsequently held that an employer can modify a claimant's benefits based solely on evidence that it has referred the claimant to available jobs within his limitations, without also having to show that the claimant's injury has improved. *See Dillon v. Workers' Compensation Appeal Bd. (Greenwich Collieries),* 536 Pa. 490, 640 A.2d 386, 392 (1994); *see also Banic v. Workers' Compensation Appeal Bd. (Trans–Bridge Lines, Inc.),* 550 Pa. 276, 705 A.2d 432, 436 (1997) (explaining that the *Kachinski* requirements are not to be rigidly applied where the facts demonstrate that such an application would be irrelevant and fruitless).

13. Clearly, if the referral resulted in a job that was accepted by the claimant, the employer may modify the claimant's benefits.

claimant's benefits should be suspended or modified based on the wages the claimant would have received at that job. *See id.;* 77 P.S. § 512(1).

Notably, in *Kachinski,* this Court did not address what occurs when an employer refers a claimant to a temporary job. However, we have since tangentially addressed this issue in *St. Joe Container Co. v. Workers' Compensation Appeal Bd. (Staroschuck),* 534 Pa. 347, 633 A.2d 128 (1993). In that case, the employer offered the claimant a non-union light-duty position, which the claimant rejected due to the fact that if he stayed at the position for more than six months, he would have had to forfeit the union benefits he had attained prior to his disability. Consequently, the employer re-offered the claimant the position, stating that it would return him to union status if he was dissatisfied after six months. The claimant nevertheless again refused the position. The workers' compensation referee determined that the claimant's second refusal was improper and modified his benefits indefinitely.[14] On appeal, the workers' compensation appeal board reversed in part and affirmed in part. According to the board, the position was only available to claimant for six months because at that point he would have had to forego his union benefits, which it viewed as an unacceptable penalty for accepting the job. Thus, the board only modified the claimant's benefits for six months. On appeal, both the Commonwealth Court and this Court affirmed. As this Court explained, the light-duty position "was acceptable alternative employment available to Claimant for the six month period commencing May 1, 1986, and ... upon expiration of this six month period the position of shipping clerk became unacceptable alternative employment unavailable to Claimant for purposes of Employer's Petition to Modify Compensation." *Id.* at 132. Thus, we affirmed the board's decision to temporarily modify the claimant's benefits for six months. *See id.*

14. The referee in this case was the equivalent of a workers' compensation judge. *See* 77 P.S. § 701. Prior to 1993, workers' compensation judges were referred to as referees. In 1993, however, the Act was amended to designate referees as workers' compensation judges. *See id.*

■ Our decision to temporarily modify the claimant's benefits in *St. Joe Container Co.* was wholly consistent with *Kachinski* because when an employer refers a claimant to a temporary job, it has clearly not attempted to fully return the claimant to productive employment, as *Kachinski* requires. To the contrary, in such circumstances, the employer has simply extended the claimant a short-term solution to his disability. While it is no doubt preferable in certain circumstances to refer the claimant to a temporary open job within his limitations rather than to no job at all, such a referral should not relieve the employer of its responsibility to locate an ongoing light-duty position that will permit the claimant to return to productive employment indefinitely. Therefore, consistent with our decision in *St. Joe Container Co.*, we hold that when an employer refers the claimant to a job, which will become unavailable to the claimant at a set date in the future, the claimant's benefits should only be modified for that period of time that the job was available regardless of whether or not the claimant accepts the position or improperly refuses it.

■ As noted above, Employer argues that the WCJ's decision to temporarily modify Claimant's benefits here was erroneous because a subsidy arrangement should not impact whether a light-duty job is deemed to be temporary or permanent. We do not agree, however, that a workers' compensation judge abuses her discretion in considering the subsidized nature of a proffered job and its effect on the temporal length of the job. Clearly, in circumstances in which the new light-duty employer that is receiving the subsidies (the "New Employer") has no interest in employing the claimant beyond the subsidy period and the claimant is therefore bound to lose the job when the subsidy is terminated, the workers' compensation judge should be free to consider this fact when assessing whether the position constitutes a mere short-term fix to the claimant's lack of productive employment. Moreover, even where the New Employer has expressed a willingness to employ the claimant once the subsidies have stopped, the workers' compensation judge may justifiably consider a subsidized job arrangement to be temporary if, for instance, the

New Employer anticipates any continued employment to be in a completely different position than that which was subsidized. To that end, where the evidence establishes, *inter alia*, that at the end of the subsidy period, the claimant will not only be asked to change his duties, but also to move to another location, reduce his hours, and work for less pay, it is within the workers' compensation judge's discretion to find that the post-subsidy job is not one in the same as the subsidized job first presented to the claimant, and that the light-duty job initially presented to the claimant was a temporary job only lasting the length of the subsidy period.[15,16]

■■■ In reviewing the evidence presented here, we find that it, and all of the reasonable inferences that may be drawn from it, were more than sufficient for the WCJ to find that Claimant's job with Smart would have either ended or significantly changed at the conclusion of the subsidy period. As detailed above, the turnover rate for employees who worked at Smart based on Expediter referrals was "very high," and very few subsidized employees actually continued to work for Smart after their time-of-injury employers stopped subsidizing their positions. *See* Marchione Dep., at 49–53; Winschel Dep., at 81–82. In addition, Ms. Marchione, the owner and president of Smart, confirmed that if Claimant stayed at Smart after the subsidy period, his position could change, his hours could be reduced, and his wages were sure to decrease.[17]

15. On the other hand, where the evidence indicates that once the subsidy ends, the only substantial change to the relationship will be the identity of the entity that pays the claimant's wages, we would anticipate that the workers' compensation judge find that the light-duty position initially presented to the claimant will continue uninterrupted beyond the subsidy period.

16. We also cannot agree with Employer that a claimant who is asked to continue working for the New Employer under these circumstances is the same as any other employee-at-will. Certainly, most employees-at-will are not expected to face a reduction in their hours or wages when they perform as expected during the first three months.

17. Indeed, Ms. Marchione conceded that Smart reduced the hours of two of the four people who remained at Smart after their time-of-injury employers stopped subsidizing their employment. *See* Marchione Dep., at 58–59. Further, in one case, the reduction in hours was due to the employee's position being changed. *See id.*

[18] *See* Marchione Dep., at 56. Moreover, the evidence established that if Claimant remained with Smart, it was likely that he would have had to obtain approval from the zoning hearing board to work from his home or pay rent for an office space from which he could work. *See supra* n. 7. Under these circumstances, it is apparent that the job that was offered to Claimant would either end or undergo material changes at the close of the subsidy period, and we therefore affirm the WCJ's finding that the position as offered was only available to Claimant for 90 days.[19]

Employer next argues that even if the surveyor position was temporary, the WCJ erred in only temporarily modifying Claimant's benefits given the Commonwealth Court's decision in *Bennett v. Workers' Compensation Appeal Bd. (Hartz Mountain Corp.)*, 158 Pa.Cmwlth. 547, 632 A.2d 596 (1993). Employer asserts that based on *Bennett*, the WCJ was required to indefinitely modify Claimant's benefits because there was no evidence that either Claimant or Employer knew that the surveyor position was temporary when it was referred to Claimant. On the other hand, Claimant argues that *Bennett* is not controlling here, and that instead, our decision in *Dillon v. Workers' Compensation Appeal Bd.*, 536

18. The evidence established that Claimant would likely be moved to a telemarketing or sales position. Significantly, however, there was no evidence submitted regarding what qualifications were required for those positions and whether those positions were within Claimant's medical limitations or vocational skills, all of which must be considered before the jobs could be considered "available" to Claimant under *Kachinski. See* Marchione Dep., at 45, 59–60, 69–70 (explaining that Claimant was given job description specifically for surveyor position, rather than sales position). Furthermore, while Ms. Marchione indicated that Claimant might make more than his subsidized wages through commissions in these new positions, she failed to specify what would happen if Claimant did not successfully perform these jobs. *See id.* at 45, 59–60, 532 A.2d 374.

19. Claimant argues that the evidence failed to establish that the surveyor position was subsidized for 90 days because neither Ms. Winschel nor Ms. Marchione specified whether that would be the extent of the subsidy period here. Nevertheless, we find that the WCJ was justified in finding that the subsidy would last for just 90 days given Ms. Winschel's and Ms. Marchione's testimony that 90 days was typically the limit on the subsidy period and given Employer's failure to present any evidence that the period would be longer here.

Pa. 490, 640 A.2d 386 (1994), dictates that the WCJ properly modified his benefits for 90 days. We agree with Claimant that *Bennett* does not control and that, consistent with our decisions in both *Dillon* and *St. Joe Container Co.,* the WCJ's decision to temporarily modify Claimant's benefits was proper.

In *Bennett,* the employer referred the claimant, Richard Bennett, to a light-duty job at Sunn Corporation's Radon Division. The Radon Division subsequently offered Bennett the job, but he refused it, citing three doctors' reports that allegedly indicated that the job was not within his medical limitations. Approximately two months later, the Radon Division was sold and the position that Bennett had been offered was apparently eliminated. Sometime thereafter, the employer filed a modification petition seeking to reduce Bennett's benefits based on his refusal to accept the Radon Division light-duty job. Bennett contested the petition, arguing that he had been physically unable to perform the position, but that even if he had been capable of performing the job and thus, rejected it in bad faith, his benefits could only be modified for the limited time period that the job had been actually available. The workers' compensation referee rejected Bennett's arguments, however, finding both that Bennett had improperly refused the Radon Division position and that his benefits should be modified indefinitely, in spite of the fact that the position had subsequently become unavailable. *See* 632 A.2d at 597–98. The workers' compensation appeal board and the Commonwealth Court affirmed.

In reviewing the referee's decision, the Commonwealth Court noted that because Bennett had improperly refused the light-duty position, he was not entitled to the same treatment as a claimant who accepts a light-duty position only to lose it later when the job becomes unavailable. *See id.* at 598 (*citing Smith v. Workers' Compensation Appeal Bd. (Futura Industries),* 80 Pa.Cmwlth. 508, 471 A.2d 1304, 1306–07 (1984), for proposition that claimant is entitled to reinstatement of benefits if after he accepts a light-duty job, he loses it through no fault of his own). As the court explained:

In the case of an employee who has accepted and performed the light-duty job [and later lost it], the focus of the inquiry is on the employee's reason for losing the job, *i.e.*, whether the loss of earnings was through "no fault of his own." Where, however, the employee has not even accepted the proffered light-duty job at the outset, this same principle does not apply because the employee, being at that time unemployed as a result of his rejection of acceptable employment, has no earnings to lose.

*Id.*

Citing several of its earlier decisions, the court elaborated that when a claimant refuses a light-duty job in bad faith, his benefits will generally be modified indefinitely "because otherwise, a claimant could cure her bad faith refusal at any time, no matter how far in the distant future, by returning at a later date and applying for the position previously offered, or by demonstrating that the employer moved the plant to a distant state ... and such employment is no longer available."[20]  *Id.* at 600.  While the court acknowledged that it had permitted only a temporary modification of benefits in *St. Joe Container Co. v. Workers' Compensation Appeal Bd. (Staroschuck)*, 141 Pa.Cmwlth. 672, 596 A.2d 1193 (1991), *aff'd,* 534 Pa. 347, 633 A.2d 128 (1993), when the claimant in that case had refused a light-duty position in bad faith, it distinguished that case from the others on which it relied by noting that the employer in *St. Joe Container Co.* had explicitly presented the non-union light-duty job to the claimant as a temporary position.  *Ben-*

**20.** The Commonwealth Court cited the following decisions for this proposition: *Korol v. Workers' Compensation Appeal Bd. (Sewickley Country Inn)*, 150 Pa.Cmwlth. 279, 615 A.2d 916 (1992) (claimant was not entitled to reinstatement of benefits when she accepted a light-duty job below pre-injury wages because she had previously improperly refused a job referred to her by employer for wages equal to her pre-injury wages); *Spinabelli v. Workers' Compensation Appeal Bd. (Massey Buick, Inc.)*, 149 Pa.Cmwlth. 362, 614 A.2d 779 (1992) (claimant was not entitled to reinstatement of benefits where she attempted to accept the light-duty job previously referred to her by her time-of-injury employer, and was denied the job because it was no longer available); *Jayne v. Workers' Compensation Appeal Bd. (King Fifth Wheel)*, 137 Pa.Cmwlth. 211, 585 A.2d 604 (1991) (claimant's benefits were properly modified when she refused to accept employer's job by time required, although she attempted to accept it hours later).

*nett*, 632 A.2d at 600. Accordingly, the court clarified that while a claimant's benefits are generally modified indefinitely after a bad faith refusal, they may be modified only temporarily in circumstances in which the job was clearly temporary at the time it was referred to the claimant. *Id.* at 598–99, 600. As the Commonwealth Court summarized:

> [W]here a claimant acts in bad faith in refusing suitable and available work, permanent at the time it is offered, the claimant's benefits are reduced for an indefinite period by the amount of earnings the job would have produced. Where a claimant acts in bad faith in refusing a position which is only a temporary job when offered, benefits will be modified for a period equal to the length of time the job was actually available. The determination of the duration of the position, either temporary or permanent, is to be made at the time of the referral and is to be based upon the information available to the employer and claimant at the time of the referral.

*Id.* at 600. Applying this test to the facts before it, the Commonwealth Court concluded that it had been proper to modify Bennett's benefits indefinitely because the evidence established that the Radon Division was expected to be permanent at the time that it was offered to Bennett.[21] *See id.*

---

**21.** Notably, Judge McGinley filed a dissenting opinion, stating that he believed that Bennett's total disability benefits should have been reinstated once the Radon Division light-duty job ceased to be available to anyone. *See id.* at 601–02, 585 A.2d 604. He explained: *"Before* the job ceased to exist[,] Claimant's loss in earnings as compared with his pre-injury situation was due to his unexcused failure to accept the offered job. *After* the offered job ceased to exist[,] Claimant's loss of earnings resulted *solely* from the disability due to that injury." *Id.* (emphasis in original). Furthermore, Judge McGinley found that the cases relied on by the majority for the proposition that benefits are generally modified indefinitely after a bad faith refusal, *see supra* n. 20, were distinguishable from *Bennett* because there was no evidence in those cases that the light-duty jobs referred to the claimants had ended prematurely. *See id.* at 602. Judge McGinley also noted that the temporary modification of Bennett's benefits would be appropriate punishment for Bennett's bad faith refusal under *Kachinski* because his benefits would be modified for that period of time that the job was actually available. *See id.* Accordingly, Judge McGinley opined that there was little "danger that bad-faith claimants [would] intentionally reject job offers with the hope that the job [would] cease to exist." *Id.*

Bennett subsequently filed a petition for allowance of appeal, which this Court granted. However, simultaneous with our grant, we remanded the case to the referee "with instructions that it be decided in accordance with this Court's recent decision in *Dillon v. WCAB*, 536 Pa. 490, 640 A.2d 386 (1994). *Bennett v. Workers' Compensation Appeal Bd. (Hartz Mountain Co.)*, 537 Pa. 433, 644 A.2d 729 (1994)." In *Dillon*, the claimant, Thomas Dillon, had been awarded partial disability benefits based on a stipulation by the parties that there were jobs he could perform within his medical limitations. Approximately one year later, Dillon filed a petition to modify his partial benefits to total benefits and produced evidence that he remained disabled from his time-of-injury position and that he had been unable to find any jobs within his limitations. The referee granted Dillon's modification petition. Upon review, however, the workers' compensation appeal board reversed, finding that Dillon was not entitled to relief because he had failed to show that his physical condition had worsened since the date he was granted partial disability benefits. On remand, in accordance with the board's decision, the referee denied Dillon's petition, and the board and the Commonwealth Court subsequently affirmed. *See id.* at 387–88.

On appeal, this Court reversed, finding that Dillon did *not* have to establish that his physical condition had changed for the worse in order to establish that he was entitled to total disability benefits. *See id.* at 391–93. Rather, we stated that Dillon only needed to prove that " 'through no fault of his own his earning power is once again adversely affected' by the injury which gave rise to his original claim." *Id.* at 393 (*quoting Pieper v. Ametek–Thermox Instruments*, 526 Pa. 25, 584 A.2d 301, 305 (1990)). Moreover, we found that Dillon met that burden by showing that the light-duty work that he was expected to perform was currently unavailable for reasons unrelated to him. *See id.*

Unfortunately, there is no record of what took place in *Bennett* following our remand and thus we do not know how the referee resolved *Bennett* in light of *Dillon*. Nevertheless, according to Claimant, the mere fact that we remanded *Ben-*

*nett* with instructions that it be decided in accordance with *Dillon* demonstrates that *Dillon* not *Bennett* controls the situation at issue here. Specifically, Claimant contends that because we held in *Dillon* that a claimant's total disability benefits may be reinstated where he establishes that a light-duty job found to be previously available to him is no longer available through no fault of his own, our remand in *Bennett* required the *Bennett* referee to find that Bennett was entitled to a reinstatement of his total disability benefits as of the date the Radon Division light-duty job became unavailable to him through no fault of his own. Claimant further contends that *Dillon* demonstrates that, contrary to the Commonwealth Court's holding in *Bennett*, a claimant's benefits should not be modified temporarily or indefinitely based on the information available to the parties at the time the job was referred to the claimant, but rather, should be modified based on the reality of the circumstances. As such, Claimant maintains that where, as here, an employer refers the claimant to a temporary job, which will be unavailable to him as of a set date, the claimant is entitled to have his total disability benefits restored at that set date and thus his total disability benefits should only be modified temporarily.

We agree with Claimant that by remanding *Bennett* to be decided in accordance with *Dillon*, we indicated that we expected courts deciding whether to restore a claimant's total disability benefits following the claimant's bad faith refusal of a job offer to apply *Dillon's* directive that benefits be restored if the claimant establishes that the light-duty job to which he was referred has subsequently become unavailable to him through no fault of his own. *See Dillon*, 640 A.2d at 393. Moreover, this is wholly consistent with our conclusion in *St. Joe Container Co.* that if the evidence establishes that the employer has referred the claimant to a light-duty job that is only temporarily available *from the outset*, meaning that the claimant is bound to lose the job through no fault of his own at a definitive point in the future, a workers' compensation judge may temporarily modify the claimant's benefits from the outset. *See St. Joe Container Co.*, 633 A.2d at 132.

Accordingly, contrary to Employer's assertions, we do not believe that the WCJ erred in failing to indefinitely terminate Claimant's benefits in accordance with the analysis of the Commonwealth Court in *Bennett* as our remand order indicated that the proper analysis is that in *Dillon*. Furthermore, because we find that *Dillon* and *St. Joe Container Co.* made clear that a workers' compensation judge may modify a claimant's benefits temporarily if a temporary job is offered to the claimant, we believe that the WCJ properly modified Claimant's benefits for 90 days based on her finding that the subsidized Smart position was a temporary position that was only available for that period of time.

In sum, we hold that the WCJ did not err in finding, on the record presented here, that the subsidized Smart position was temporary, and therefore also did not err in modifying Claimant's benefits for the 90 days that the position was available to Claimant. The Commonwealth Court's decision is affirmed.

Former Justice LAMB did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion.

Justice NEWMAN files a dissenting opinion in which Mr. Justice Eakin joins.

### CONCURRING OPINION

Justice SAYLOR.

I join the majority opinion, except for its treatment of the Commonwealth Court's decision in *Bennett v. WCAB (Hartz Mountain Corp.)*, 158 Pa.Cmwlth. 547, 632 A.2d 596 (1993).

With regard to *Bennett*, I read the order crafted by this Court on appellate review, not as a *per curiam* reversal (which would reflect a directive from this Court in terms of the actual merits disposition for the case, thus embodying a holding having the effect of precedent), but as in the nature of a grant, vacate, and remand order (which merely requires reconsideration by the intermediate appellate court of its prior decision to assess the import of some principle or authority identified by this Court). *See Bennett v. WCAB (Hartz Mountain Corp.)*,

537 Pa. 433, 644 A.2d 729 (1994). In the face of new decisions that clarify relevant, underlying legal principles, this Court occasionally will remand an appeal to the intermediate appellate court so that it can ensure that its reasoning fully comports with the law as clarified. The clarification may affect the disposition of the case in some circumstances, but in others it will not—this is, in the first instance, a matter to be determined by the intermediate appellate court in the remand proceedings. Such understanding of this Court's decision to remand *Bennett* in light of *Dillon v. WCAB (Greenwich Collieries)*, 536 Pa. 490, 640 A.2d 386 (1994), seems particularly apt, not only because the Court chose not to reverse the Commonwealth Court's existing decision, but also since *Dillon* embodied a clarification of some fundamental concepts at work in *Bennett*, but did not address itself to *Bennett's* central question, namely, the effect of a claimant's bad-faith refusal of an offer of permanent employment.

As the majority notes, the offer of permanent employment at issue in *Bennett, see Bennett*, 158 Pa.Cmwlth. at 554, 632 A.2d at 600, is also materially different from the circumstances under review here, where the fact-finder determined, based on substantial evidence, that the relevant offer involved temporary employment. Moreover, it seems to me that the employer's position, as concerns bad-faith refusal of an offer of permanent employment, is materially stronger than in the scenario in which the employment can be deemed to have been temporary from the outset. Thus, I would leave the matter of the validity of *Bennett's* holding ("[W]here a claimant acts in bad faith in refusing suitable and available work, permanent at the time it is offered, the claimant's benefits are reduced for an indefinite period by the amount of the earnings the job would have produced."), *id.* at 555, 632 A.2d at 600, for a future case involving salient facts.

## DISSENTING OPINION

Justice NEWMAN.

Because I believe that the Workers' Compensation Judge (WCJ) erroneously concluded that the position offered to

James Myers (Claimant) was akin to the provision of a temporary light-duty position by the employer, with a modification of Claimant's benefits for a period of ninety days to reflect his refusal of employment, I must respectfully dissent. This Court granted allowance of appeal to ascertain whether, as the WCJ found, subsidized employment is the functional equivalent of temporary light-duty employment. We further agreed to review whether an offer of a subsidized position commands the reinstatement of total disability benefits when the period of subsidization ends.

Where an employer presents a claimant with an offer of available work within the claimant's physical limitations, and the claimant refuses to accept such an offer, the claimant's benefits may be modified. *Kachinski v. Workers' Compensation Appeal Bd. (Vepco Constr. Co.)*, 516 Pa. 240, 532 A.2d 374 (1987). This Court established the following four-pronged test to be applied in this type of case

1. The employer who seeks to modify a claimant's benefits on the basis that he has recovered some or all of his ability must first produce medical evidence of a change in condition.[1]

2. The employer must then produce evidence of a referral (or referrals) to a then open job (or jobs), which fits in the occupational category for which the claimant has been given medical clearance, *e.g.*, light work, sedentary work, etc.

---

1. We have previously held, as recognized by the Majority, that the four-prong analysis of *Kachinski* is not to be rigidly applied to situations in which an employer seeks to suspend or terminate a claimant's benefits because the claimant's loss of earning power is no longer caused by the work-related injury. *Banic v. Workmens Compensation Appeal Bd. (Trans–Bridge Lines, Inc.)*, 550 Pa. 276, 705 A.2d 432 (1997). That is to say, in such situations, we have allowed a modification of benefits without requiring proof of all of the *Kachinski* prongs. *Id.* at 436–37. Our decisions demonstrate that both the facts and the basis upon which the modification of benefits is sought determine which prong or prongs of *Kachinski* need not be met. *See, e.g., Dillon v. Workmens Compensation Appeal Bd. (Greenwich Collieries)*, 536 Pa. 490, 640 A.2d 386 (1994) (recognizing that the first prong of *Kachinski* requiring medical evidence of a change in condition does not apply if a modification of benefits is not premised on the assertion that the injured employee has recovered some or all of his ability).

3. The claimant must then demonstrate that he has in good faith followed through on the job referral(s).

4. If the referral fails to result in a job then claimant's benefits should continue.

*Id.* at 380. We further emphasized that:

Obviously, the viability of this system depends on the good faith of the participants. The referrals by the employer must be tailored to the claimant's abilities . . . and be made in a good faith attempt to return the injured employee to productive employment, rather than a mere attempt to avoid paying compensation. By the same token, employees must make a good faith effort to return to the work force when they are able, and their benefits can be modified for failure to follow up on referrals or for willfully sabotaging referrals. **If an employee refuses a valid job offer[,] his benefits can also be modified if it is found he had no basis upon which to do so.**

*Id.* (emphasis added). Notably, this Court did not limit the modification of an employee's benefits to those instances in which the employer offers the employee only permanent work. In the instant matter, General Electric Co. (Employer) met the first two *Kachinski* prongs, but the Claimant failed to meet the latter two prongs. Accordingly, I believe that Employer is entitled to an indefinite modification of benefits where Claimant failed to pursue the Smart position in good faith. This is also applicable on the basis that Claimant refused a valid offer of employment.

From the record evidence, the WCJ found that the telephone survey position offered to Claimant would have been available to him for only ninety days and, on that basis, concluded that the reduction of Claimant's workers' compensation benefits required by his refusal of the position without good cause must be limited in effect to the same period. Employer contends first, that the Commonwealth Court erred as a matter of law in equating a limited period of employer subsidization with temporary employment and, in any event, that each of the tribunals below misread the record as supporting such a limitation on the term of the position offered to

Claimant. I believe that the Majority has subscribed to this same error.

I agree with Employer that this record contains inadequate evidentiary support for the necessary finding below that the position offered to Claimant would have been available for only ninety days. The testimonial evidence is of usual cases, common practices, and typical ranges of the term of subsidization. There is simply no evidence that a ninety-day period of subsidization was preset at the outset for the telephone survey position offered to Claimant. Evidence that a five-hundred hour or ninety-day subsidization period is "common"; that there is "usually" an end point to subsidization; that "typically" the Smart Telecommunication's job referrals from Expediter are subsidized for an "indefinite period of time," "anywhere from a week to three months," and that the longest period of subsidization in the experience of the witness was "about six months" is, irrespective of the assessment of the credibility of the witnesses and the weight to be accorded to the evidence, simply inadequate to support the WCJ's pivotal finding: that the telephone survey "position was a funded position only guaranteed for a period of ninety (90) days."

The Majority discerns from the deposition testimony that, after the period of subsidization, the position, pay, and hours of Claimant would change rendering this a completely different job. However, just as there is no evidence that the subsidy was to end after five hundred hours or ninety days, there is also no evidence of record that the position, pay, and hours would change following the termination of the subsidy period.

In applying *Kachinski*, the Commonwealth Court imposed a fairly strict application of the good faith requirement. Where a claimant is offered suitable employment, the claimant cannot decide that he does not like the position,[2] resign and accept

**2.** *See, e.g., Korol v. Workmen's Compensation Appeal Bd. (Sewickley Country Inn)*, 150 Pa.Cmwlth. 279, 615 A.2d 916 (1992); *Scheib v. Workmen's Compensation Appeal Bd. (Ames Dept. Store)*, 143 Pa. Cmwlth. 193, 598 A.2d 1032 (1991); *Hendry v. Workmen's Compensa-*

another position he cannot perform,[3] or remain in a lower paid position [4] to avoid a suspension of benefits because of bad faith. The rationale employed by the Commonwealth Court in these cases is that, unlike a claimant who has accepted employment that is terminated, the claimants in these cases are unemployed, not because of a medical disability, but because they chose not to accept employment made available by the employer. Thus, when an employer offers a claimant a position within his physical limitations, a claimant is obligated to accept that offer of available employment in good faith or suffer a suspension of his benefits. Further, the Commonwealth Court has concluded that, once a claimant has exhibited bad faith by refusing employment within his restrictions, the claimant cannot cure his bad faith by finding another job. *See, e.g., Liggett v. Workmen's Compensation Appeal Bd. (SEPTA),* 669 A.2d 513 (Pa.Cmwlth.1996); *Johnson v. Workmen's Compensation Appeal Bd. (McCarter Transit, Inc.),* 168 Pa.Cmwlth. 439, 650 A.2d 1178 (1994); *Korol v. Workmen's Compensation Appeal Bd. (Sewickley Country Inn),* 150 Pa.Cmwlth. 279, 615 A.2d 916 (1992). This is the teaching of *Kachinski,* as applied by the Commonwealth Court in many opinions.

Employer here relies on *Bennett v. Workmen's Compensation Appeal Bd. (Hartz Mountain Corp.),* 158 Pa.Cmwlth. 547, 632 A.2d 596 (1993). In *Bennett,* the claimant followed up on numerous referrals produced by the employer. However, when he was offered a permanent, light-duty position at a lower wage than his pre-injury job, he refused the offer, and sabotaged the interview by giving the interviewer three reports stating that he was totally disabled. Three months later, the light-duty position was eliminated for economic reasons. The employer sought a modification of benefits and

tion Appeal Bd. (*Miller & Norford, Inc.*), 133 Pa.Cmwlth. 28, 577 A.2d 933 (1990).

**3.** *See, e.g., Brooks v. Workers' Compensation Appeal Bd. (Brockway Glass),* 770 A.2d 810 (Pa.Cmwlth.2001).

**4.** *See, e.g., IGA Food Mart v. Workmen's Compensation Appeal Bd. (Kugler),* 674 A.2d 359 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 546 Pa. 649, 683 A.2d 886 (1996).

the referee[5] reduced the claimant's benefits from total to partial, based upon the wages he would have earned had he accepted the position proffered. The claimant in that case argued that he was entitled to a reinstatement of total disability benefits as of the date when the job was eliminated. He contended that the employer was in the same position after the job was eliminated that he would have been had the claimant accepted the job. The referee rejected this argument and the Commonwealth Court affirmed finding that:

> [W]here a claimant acts in bad faith in refusing suitable and available work, *permanent at the time it is offered,* the claimant's benefits are reduced for an indefinite period by the amount of earnings the job would have produced. Where a claimant acts in bad faith in refusing a position[,] which is only a temporary job when offered, benefits will be modified for a period equal to the length of time the job was actually available. The determination of the duration of the position, either temporary or permanent, is to be made *at the time of the referral* and is to be based upon the information available to the employer and claimant at the time of the referral.

*Id.* at 600 (footnote omitted) (emphasis added). In the instant matter, there is no evidence that the position offered was temporary; that it had an end date; and neither Claimant nor Employer considered it temporary.

This Court remanded *Bennett* for a decision in accordance with *Dillon v. Workmen's Compensation Appeal Bd. (Greenwich Collieries),* 536 Pa. 490, 640 A.2d 386 (1994). I believe that our concern in *Bennett* was the requirement imposed by the Commonwealth Court that a finding of bad faith on the part of a claimant justifies a reduction of temporary total disability benefits for an *indefinite period.* Thus, we remanded *Bennett* so that the Commonwealth Court could consider whether Bennett's loss of earning capacity was due to a lack of

5. Prior to the 1993 amendments to the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2626, the role now fulfilled by workers' compensation judges was performed by referees.

available employment through no fault of his own. In *Dillon*, we addressed, *inter alia*, the issue of *economic disability*. There we said:

Inasmuch as both capacity to work and availability of work affect the extent of an injured employee's disability (loss of earning power), it follows that disability, for compensation purposes, may change from partial to total or vice versa based on a change in one with or without a change in the other. [The] Commonwealth Court correctly recognized this in *Lukens, [Inc. v. Workmen's Compensation Appeal Bd.,* 130 Pa.Cmwlth. 479, 568 A.2d 981 (1989)] when it held that the "medical evidence of a change in condition" criterion recognized in *Kachinski* applies only when the employer "seeks to modify a claimant's benefits on the basis that he has recovered some or all of his ability," and *such proof "is not required when that is not the basis for seeking a decrease in benefits."*

*Dillon*, 640 A.2d at 392 (emphasis added). In *Dillon*, a claimant sought modification of his award for partial disability to one for total disability on the basis that no jobs within his physical restrictions were available. Based on this showing, this Court found that his loss of earning power was not his fault and awarded total disability compensation. I believe that this was the examination that we directed the Commonwealth Court to undertake in the remand of *Bennett.*

We have said that, where an increase in existing benefits is sought, the inability to return to light-duty work may be offered to establish the impact on earning power and the burden shifts to the employer to demonstrate that the claimant has the ability to generate earnings consistent with his physical limitations. *Stanek v. Workers' Compensation Appeal Board (Greenwich Collieries)*, 562 Pa. 411, 756 A.2d 661 (2000). Relying on *Dillon*, this Court went on to state in *Stanek* that:

Where, however, as here, the claimant has not engaged in the light-duty work which was found to be available and consistent with his physical limitations in connection with the award of compensation for partial disability, his burden

will be greater. First, depending upon the circumstances, the claim may be vulnerable to denial on the basis of voluntary retirement. Second, the claimant will not be afforded the benefit of the presumption of total disability from an inability to perform an existing light-duty job. Rather, the claimant is in the position of having to prove a negative (*i.e., that there are no jobs available in which he could work consistent with his physical limitations*). In this setting, medical testimony which concedes that a claimant retains the physical ability to accomplish light-duty work, with no vocational or other form of assessment as to why such work is not available, *will be deemed fatal to the claim.*

*Id.* at 669 (internal citations omitted) (emphasis added and in original). In the matter *sub judice,* medical testimony was admitted to the effect that Claimant was cleared for the Smart position. Moreover, Claimant did not introduce any evidence that, despite his failure to accept this position, there were no other light-duty jobs available within his medical restrictions. After Employer adduced evidence that Claimant refused an offer of employment within his medical restrictions, the burden shifted to Claimant, pursuant to *Stanek* and *Dillon,* to demonstrate that there were no light-duty jobs available to him.

Critically, *Bennett* holds that the distinction between temporary and permanent employment is made at the time that the job is proffered. If a claimant rejects a position that is considered permanent at the time it is offered, then the claimant has exhibited bad faith. It is beyond cavil that *Kachinski* makes no distinction between temporary and permanent employment. Pursuant to *Kachinski,* within the context of bad faith and with certain exceptions not relevant to the instant matter,[6] a claimant must at least attempt a position offered that complies with his medical restrictions, regardless of whether the position is temporary or permanent, or face modification of benefits. Where *Bennett* continues and holds

6. *See, e.g., St. Joe Container Co. v. Workmen's Compensation Appeal Bd. (Staroschuck),* 534 Pa. 347, 633 A.2d 128 (1993).

that partial disability benefits may not be reinstated where a job essentially evolved into a temporary position—one that is based on a showing of bad faith—*Dillon* and *Stanek* hold that, for a reinstatement of benefits to occur, the claimant must demonstrate that there are no jobs available within his or her medical restrictions.

Further support for the proposition that benefits are suspended where a claimant exhibits bad faith in pursuing available work is provided by the decision of this Court in *Harle v. Workmen's Compensation Appeal Bd. (Telegraph Press, Inc.)*, 540 Pa. 482, 658 A.2d 766 (1995). In *Harle*, we determined that, when a claimant with a residual disability returned to work with a different employer without any loss in earning power, and subsequently lost that job due to the closing of the business, the claimant was not entitled to a reinstatement of total disability benefits because the loss of earning power was unrelated to the disability. As in the instant matter, Claimant's loss of earning power is not due to his physical limitations, but to his failure to pursue employment offered to him that fit within his medical and occupational restrictions. There was no discussion in *Harle* as to whether the employment became temporary because of the business closure.

In *Inglis House v. Workmen's Compensation Appeal Bd. (Reedy)*, 535 Pa. 135, 634 A.2d 592 (1993), a claimant filed a claim petition alleging an injury and entitlement to total disability benefits from her original employer, even after she returned to work with another employer without a loss of earning power but with some residual disability. She voluntarily quit that job and filed for reinstatement of total disability benefits because her original employer did not prove work was available to her within her limitations. This Court explained that the employer did not have to prove work availability because the claimant's loss of earning power was not related to her disability.

In the instant matter, Employer made a position available to Claimant, which he refused. At the hearing before the WCJ, Claimant agreed that he had medical clearance and was capable of doing the job. The WCJ determined that Claimant

could perform the duties of the position and modified Claimant's benefits. However, the WCJ also concluded that the position was an Employer-created, light-duty position that was temporary, not permanent. After making that finding, the WCJ defined the term of the temporary employment as the customary ninety-day period of subsidization, based on the testimony of Stacey Marchione, the owner of Smart. However, we must address whether a finding of subsidization equals a finding of temporary employment and whether that alters the analysis set forth in *Kachinski.* I believe that it does not.

I do believe that one viable principle emerged from the decision of the Commonwealth Court in *Bennett,* which is that the determination of the permanent or temporary nature of the position should be decided at the time that the position is offered. The Majority concludes that, even if Smart hired Claimant at the end of the subsidization period, that the job, the hours, and the pay would change, virtually rendering the position offered a temporary one. I believe that subsidized employment only becomes temporary employment where there is no intent on the part of the employer receiving the wage subsidies to assimilate the employee into its work force. In the instant matter, the testimony indicated that both Employer and Smart intended that Claimant be assimilated as a regular employee on Smart's payroll and, in fact, Smart had hired at least four such previous employees. Accordingly, I believe that the WCJ erred in concluding that subsidized employment and temporary employment were the same for purposes of determining that disability benefits should be awarded only for a closed period. It was further error on the part of the WCJ to reinstate total disability benefits after a finding of bad faith where the Claimant did not demonstrate that there were no jobs within his medical restrictions available to him.

Based on established workers' compensation jurisprudence in this Commonwealth, Claimant's benefits should be modified indefinitely, following a finding of bad faith, until Claimant demonstrates that there is no work available to him within his medical restrictions. If Claimant had accepted the position

and had been hired at the end of the subsidy period, he would be working today. If Claimant had accepted the position and been dismissed, he would have been entitled to a reinstatement of benefits.[7] If Claimant had accepted the position and his salary had been reduced at the close of the subsidy period when he was placed on the Smart payroll, Claimant would have been entitled to increased partial disability benefits.[8] Instead, Employer was deprived of the opportunity to have Claimant reenter the work force.

It is my belief that, on this record, Employer clearly demonstrated that work was available to Claimant within his medical restrictions and that Claimant acted in "bad faith" in refusing employment. Therefore, Claimant's loss of earning power resulted from his refusal to return to gainful employment. At that point, Claimant was required to show that the work was "unavailable" to him [9] or that there were no jobs available that he could perform within his work restrictions to effect a reinstatement. Claimant failed to carry his burden of proof that he was deserving of reinstatement by proving the negative required by *Stanek*, and the WCJ erred in reinstating Claimant's benefits at the end of a closed period. The fact that Employer was subsidizing the employment does not make it temporary in nature where the owner of Smart testified that, if Claimant met the qualifications for regular, full-time employment, Claimant would be placed on its regular payroll. Claimant should have attempted the position and, at the close of the subsidization period, if the position terminated through no fault of his own, he should have pursued the options available to him pursuant to the Act. As observed by the

**7.** *See, e.g., Teledyne McKay v. Workmen's Compensation Appeal Bd. (Osmolinski),* 688 A.2d 259 (Pa.Cmwlth.1997).

**8.** *See* 77 P.S. § 772. This section also states that where compensation has been suspended because the employe's earnings are equal to or in excess of his wages prior to the injury that payments under the agreement or award *may be resumed at any time during the period for which compensation for partial disability is payable,* unless it be shown that the loss in earnings does not result from the disability due to the injury. *Id.* (Emphasis added.)

**9.** *See St. Joe Container Co. v. Workmen's Compensation Appeal Bd. (Staroschuck),* 534 Pa. 347, 633 A.2d 128 (1993).

Commonwealth Court in *Bennett*, "[i]t is eminently fair to require claimants who act in bad faith to live with the foreseeable consequences of their actions and a rule which would discourage bad faith on the part of claimants would further ensure the cooperation of efforts necessary to maintain the [equality] of the system." *Bennett*, 632 A.2d at 600. The decision reached by the Majority rewards the Claimant in this case for bad faith conduct and chills the viable attempt of an Employer to return an injured worker to gainful employment. The modification of Claimant's benefits should be effected, not according to the principles enunciated in *Bennett*, but consonant with *Dillon* and *Stanek*, until Claimant can demonstrate that there are no jobs available to him within his medical restrictions. Where there is no evidence that the subsidization period has a definite terminus, there can be no finding that subsidized employment is temporary employment for the purposes of benefit modification. Further, subsidized employment may only be considered temporary where there is a lack of intent on the part of the new employer to assimilate the employee into its workforce. In the instant matter, Claimant never gave the employment opportunity with Smart a chance to extend beyond the subsidy period. Accordingly, I believe that the decision of the Commonwealth Court must be reversed and that Employer's Petition requesting a modification of benefits should be granted.

Justice EAKIN joins this dissenting opinion.