**Philip FURNARI, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (TEMPLE INLAND and Chartis/AIG/ESIS), Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 18, 2013.
Decided April 10, 2014.

Donald C. Ligorio, Kingston, for petitioner.

Michael S. Faber, Pittsburgh, for respondents.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and COVEY, Judge.

OPINION BY Judge COVEY.

Philip Furnari (Claimant) petitions this Court for review of the Workers' Compensation Appeal Board's (Board) June 11, 2013 order affirming the Workers' Compensation Judge's (WCJ) order denying Claimant's Petition for Reinstatement of Compensation Benefits (Reinstatement Petition)/Claim Petition. There are six issues for this Court's review: (1) whether the WCJ and the Board erred by applying an improper burden of proof; (2) whether the WCJ and the Board erred by not finding Temple Inland (Employer) responsible for paying Claimant benefits; (3) whether the WCJ's finding that Claimant did not experience a worsening of his condition was based on substantial evidence; (4) whether the WCJ and the Board's finding that Claimant could perform available work as of April 2009 was based on substantial evidence; (5) whether the WCJ and the Board erred by failing to make a finding relative to the duration that the light-duty position offered to Claimant was available; and, (6) whether the WCJ and the Board erred by relying on a job description that contained inadmissible hearsay. We reverse that part of the Board's

June 11, 2013 order applying a Claim Petition burden of proof, and affirm the remaining portions of the Board's order.

Claimant worked full-time for Employer as a corrugated box designer. On October 10, 2008, Claimant slipped, twisted and heard a snap in his right knee while at work. He was taken to the hospital. He underwent right knee surgery a few days later. Employer issued a Notice of Compensation Payable (NCP) on October 27, 2008, in which it agreed to pay medical expenses related to Claimant's right knee tendon tear, and it agreed to continue Claimant's salary. Claimant returned to work in a restricted capacity on November 24, 2008. Employer modified Claimant's job, but continued to pay his full salary. Claimant resigned from his employment with Employer on April 3, 2009, at which time Employer stopped paying Claimant's salary.

■ On September 25, 2009, Claimant filed a Reinstatement Petition seeking temporary total disability benefits alleging that his injury had worsened and that his earning power was affected. Employer filed an answer denying Claimant's allegations. Hearings were held before the WCJ on November 3, 2009, April 13, 2010 and September 30, 2010. At the November 3, 2009 hearing, Claimant amended his Reinstatement Petition to a Reinstatement Petition and/or Claim Petition to address the question of his compensation.[1] Employer amended its answer denying Claimant's Claim Petition allegations. On August 30, 2011, the WCJ denied Claimant's Reinstatement Petition on the basis that Employer's issuance of the NCP and payment of Claimant's salary constituted a *de facto* NCP, and that Claimant failed to meet his burden of proving that his condition had worsened to such an extent that he could not perform a modified job that was available to him. Claimant and Employer appealed to the Board. On June 11, 2013, the Board disagreed with the WCJ's finding that the medical-only NCP was a *de facto* NCP, and application of a Reinstatement Petition burden of proof; however, it affirmed the WCJ's decision because Claimant failed to meet his burden of proof that he experienced a worsening of his condition. Claimant appealed to this Court.[2]

■ Claimant first argues that the WCJ and the Board erred by applying an improper burden of proof. He specifically claims that the WCJ erroneously applied the burden of proof associated with a Claim Petition, rather than a Reinstatement Petition. Claimant's interpretation

---

1. Claimant wrote on his November 3, 2009 First Hearing Filing–Moving Party submission:

 The Claimant requests that this petition be treated as a Claim Petition as necessary. The Claimant received salary continuation in lieu of compensation. It is the Claimant's position that the NCP in this case acknowledges a claim and requires payment of benefits pursuant to a Reinstatement Petition. However, to the extent necessary[,] the Claimant requests that this petition be amended to be considered as a Claim Petition.

 Notes of Testimony, November 3, 2009 (N.T. 11/3/09), Ex. C–1. During the hearing, the WCJ clarified: "So you're making a formal ... request that this be amended so you can proceed in the alternative as a Reinstatement and a Claim?" Claimant's Counsel responded, "Yes." N.T. 11/3/09 at 6.

2. "This Court's scope and standard of review of an order of the Board is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether Board procedures were violated, whether constitutional rights were violated or an error of law was committed." *World Kitchen, Inc. v. Workers' Comp. Appeal Bd. (Rideout)*, 981 A.2d 342, 346 n. 5 (Pa.Cmwlth.2009).

notwithstanding, the WCJ properly applied the Reinstatement Petition burden.

■ This Court has held:

A claimant seeking disability benefits [by Claim Petition] must prove that he has suffered a disability caused by a work-related injury. The claimant must show not only physical impairment, but also a loss of earning power. A 'disability' means a loss of earning power, not a physical disability caused by a work injury. If the claimant's loss of earnings is the result of the work injury, he is entitled to disability benefits; if not, benefits must be suspended.

*Brewer v. Workers' Comp. Appeal Bd. (EZ Payroll & Staffing Solutions)*, 63 A.3d 843, 848 (Pa.Cmwlth.2013) (citations omitted). Relative to reinstatement petitions, Section 413(a) of the Workers' Compensation Act (Act)[3] states, in pertinent part:

A workers' compensation judge designated by the department may, at any time ... reinstate ... a notice of compensation payable ... upon proof that the disability of an injured employe has increased ... [or] recurred.... Such ... reinstatement ... shall be made as of the date upon which it is shown that the disability of the injured employe has increased ... [or] recurred....

77 P.S. § 772. "Generally, a claimant seeking reinstatement ... must prove that through no fault of his own, his disability is again adversely affected by the work injury, and the disability giving rise to the original claim continues." *Ward v. Workers' Comp. Appeal Bd. (City of Phila.)*, 966 A.2d 1159, 1162 (Pa.Cmwlth.2009).

Here, the WCJ found that "Employer has shown that [its] salary continuation was a *de facto* [NCP]," so he applied the burden of proof applicable to Reinstatement Petitions. WCJ Dec. at 14. Based on the evidence, however, the WCJ concluded that "Claimant has not met his burden of proving that his work-related disability worsened to the point that he could not perform the specially[-]created, modified[-]duty job when he left work, and benefits remain suspended." WCJ Dec. at 14. The WCJ therefore ordered that "Claimant's Petition, originally filed as a petition to Reinstate Benefits ... and amended ... to a Claim Petition, is DENIED and DISMISSED." WCJ Dec. at 14.

The Board, on the other hand, concluded:

We cannot agree that [Employer's] salary continuation payments to Claimant created a '*de facto* NCP.'

. . . .

Here, [Employer] issued a medical-only NCP and kept Claimant on the payroll at full pay. There is no serious dispute that Claimant continued to have a work-related physical disability throughout the time he remained employed by [Employer]. However, he had no loss of earnings and thus, disability was not already established when Claimant's petition was filed.... Consequently, in order to establish eligibility for indemnity benefits, Claimant is required to establish disability and duration of disability [via a claim petition].

Board Op. at 4. The Board acknowledged, however, that since Claimant could not have prevailed under either a reinstatement or claim petition standard, the WCJ's error was harmless.

■ The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd.*

---

**3.** Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

*(Hicks)*, 16 A.3d 1225, 1229 n. 8 (Pa. Cmwlth.2011). This Court has stated: "[I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd)*, 933 A.2d 1095, 1101 (Pa.Cmwlth. 2007) (quoting *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa.Cmwlth.2005)). "We review the entire record to determine if it contains evidence a reasonable mind might find sufficient to support the WCJ's findings. If the record contains such evidence, the findings must be upheld even though the record contains conflicting evidence." *Lahr Mech.*, 933 A.2d at 1101 (citation omitted).

> Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. In performing a substantial evidence analysis, this court must view the evidence in a light most favorable to the party who prevailed before the factfinder. Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.

*Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 168 (Pa.Cmwlth.2003) (citations omitted).

Section 406.1 of the Act provides, in pertinent part:

> (a) The employer ... shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of compensation due either pursuant to an agreement upon the compensation payable or a notice of compensation payable as provided in [S]ection 407 [of the Act, 77 P.S. § 731,] ... on forms prescribed by the department and furnished by the insurer.... Any payment of compensation ... subsequent to [a] ... notice of compensation payable ... or greater in amount than provided therein shall, to the extent of the amount of such payment or payments, discharge the liability of the employer with respect to such case.
>
> (b) Payments of compensation pursuant to an agreement or notice of compensation payable may be suspended, terminated, reduced or otherwise modified by petition and subject to right of hearing as provided in [S]ection 413. [of the Act, 77 P.S. §§ 771–774].

77 P.S. § 717.1.[4]

The NCP form under the section entitled "Compensation is payable as follows," lists five statements for employers to complete pertaining to a claimant's compensation. Preceding those questions is a box containing the following statement: "Check only if compensation for medical treatment (medical only, no loss of wages) will be paid subject to the [Act].... For compensation for medical treatment only, you should not complete numbers 1 through 5." Reproduced Record (R.R.) at 71a. Employer herein checked the box, but also answered NCP Question No. 4 which reads: "**[p]ayments will hereafter be made:** ____ Weekly ____ Biweekly ____ Other (Specify): [Claimant] is **on salary continuation.**" R.R. at 71a (emphasis added).

At the hearings, Employer's in-house Human Resource Manager, Angela Lex (Ms. Lex) testified that Claimant "was on salary continuation." R.R. at 112a. She also explained that if Claimant had not resigned, Employer would have continued

---

**4.** Added by Section 3 of the Act of February 8, 1972, P.L. 25.

to accommodate Claimant's restrictions and "still pay him the same salary." R.R. at 125a. Ms. Lex further acknowledged that there was no dispute that Claimant had an injury and Employer accepted the claim. *See* R.R. at 139a. Employer's Regional Human Resource Manager Jerry Henehan (Mr. Henehan) testified that Employer was "very anxious to get [Claimant] back.... [H]e's a very talented designer, and they were very anxious to get him back on site." R.R. at 308a. Based upon the evidence before him, the WCJ found that "Claimant was on a salary continuation in lieu of compensation" and that "[Employer's] payment of full salary in lieu of compensation, along with payment of all medical expenses, constitutes a *de facto* [NCP]." WCJ Finding of Fact (FOF) ¶¶ 2, 15. The WCJ also determined: "[H]is substantial salary continuation in lieu of compensation is accepted as evidence that [Claimant] was a valued employee." WCJ FOF ¶ 8.

▮▮▮ Salary continuation does not necessarily discharge an employer from its obligations under the Act. "Payments in lieu of compensation are 'any voluntary or informal compensation, apart from the Act, **paid with the intent to compensate for a work-related injury.**'" *Wallace v. Workers' Comp. Appeal Bd. (Pittsburgh Steelers)*, 722 A.2d 1168, 1170 (Pa.Cmwlth.1999) (quoting *Pittsburgh Steelers Sports, Inc. v. Workers' Comp. Appeal Bd. (Erenberg)*,

145 Pa.Cmwlth. 547, 604 A.2d 319, 322 (1992)) (emphasis added).

[I]t is the *intent* of payment that is its predominant characteristic.

In order to demonstrate necessary intent, the burden is upon claimant to show that the monies paid to him were paid and received *as compensation* under the Act and the record must demonstrate that such finding is based on substantial evidence.

*NUS Corp. v. Workmen's Comp. Appeal Bd. (Garrison)*, 119 Pa.Cmwlth. 385, 547 A.2d 806, 809 (1988).[5] However, this Court has explained that "if the claimant is totally disabled and the money is being paid in relief of the employee's capacity to labor, it having been determined that the employee is entitled to workmen's compensation, **the amount paid *raises a rebuttable presumption,* a sufficient inference of an intent to compensate.**" *Id.* at 810 (bold emphasis added). Thus, under certain specific circumstances, a claimant need not prove the employer's intent concerning its salary continuation. Rather, the burden is on the employer to rebut the presumption.

▮▮▮ Here, Employer's evidence did not rebut the presumption that the continuation of Claimant's full salary was to compensate him for his work-related injury. It is undisputed that Claimant suffered a right knee injury during the course and scope of his employment. Employer acknowledged and accepted Claimant's inju-

---

5. We acknowledge that this case law was developed in the context of Section 315 of the Act, 77 P.S. § 602.

> Section 315 of [t]he [Act] ... states that all compensation claims are forever time-barred unless a claim petition is filed within three years of the injury. This section provides that the running of the three-year period will be tolled if payments of compensation have been made, including payments made in lieu of compensation, in which

> case the time period will be extended to three years from the time of making the most recent payment. These payments must be made by employer for a work-related injury and with the intent to compensate the claimant for this injury.
>
> *Bergmeister v. Workmen's Comp. Appeal Bd. (PMA Ins. Co.)*, 134 Pa.Cmwlth. 104, 578 A.2d 572, 574 (1990), *aff'd*, 529 Pa. 1, 600 A.2d 531 (1991) (citation omitted). However, the case law is instructive for the analysis before us.

ry as work-related and the description thereof as set forth in the NCP. *See* R.R. at 71a. Claimant was unable to work for a time due to his work-related injury. Recognizing and accepting Claimant's disability, i.e. loss of earning power, Employer answered NCP Question No. 4, which was to be answered only if the Employer intended to make wage loss payments, and in fact, Employer paid Claimant his full salary while he was off work.[6] Thereafter, when Claimant could return to work but not at his full capacity, Employer created a modified job for Claimant that was appropriate for his ongoing physical limitations. Employer continued to compensate Claimant at his full salary in his modified position. Based upon these undisputed facts, we conclude that the record contains substantial evidence to support the WCJ's determination that the proper burden of proof was for a reinstatement petition because the Employer's acceptance of Claimant's work-related injury as documented in the NCP, together with its statement of salary continuation contained in the NCP and salary continuation in fact established Claimant's work-related disability. Accordingly, where there is both a documented work-related injury, either by adjudication or acceptance such as an NCP **and** that injury gives rise to a disability, i.e. loss of earning power, the proper burden of proof is that of a reinstatement petition. In the absence of both or either of these prongs, the burden of proof is that of a claim petition. Thus, the proper burden of proof herein was that for a Reinstatement Petition.

 There being a *de facto* NCP, the proper method by which Claimant could seek wage loss benefits after April 3, 2009, when he separated his employment with Employer and Employer ceased paying Claimant his salary, was by filing a Reinstatement Petition. Accordingly, the Board erred by applying a Claim Petition burden. However, since the WCJ applied the correct burden of proof, and both the WCJ and the Board concluded that Claimant failed to establish that his earning power was adversely affected by his work-related injury when he ended his employment, Claimant could not have prevailed under either standard; therefore, the Board's error was harmless.

 Claimant next asserts that the WCJ and the Board erred by refusing to find that Employer was obligated to pay him workers' compensation benefits as a result of the *de facto* NCP. Claimant specifically contends that because Employer did not file a petition to suspend Claimant's benefits after he quit in April 2009, Employer was under a continuing obli-

---

**6.** Employer referred to its NCP Question No. 4 answer as "simply a notation," and maintained that it would not have accepted wage loss liability when it was paying Claimant twice the amount in salary, which he would not have been entitled to receive for wage loss benefits under the Act. Employer Br. at 21.

At the hearing, Employer's counsel asserted, in pertinent part:

[I]t was issued as a medical-only NCP and was paid salary continuation. And that's the—I guess interesting area of law, because when you pay salary continuation, do you then have to file a Bureau form acknowledging the return to work? Because you haven't really paid Workers' Compensation benefits for wage loss. The NCP—I agree the NCP was filed for medical treatment only, but that's for medical treatment only. It's not an acknowledgement of wage loss.... My position is that the NCP, medical only as is designated on it, only acts as a recognition of the responsibilities for the payment of medical bills.

N.T. 11/3/09 at 7–8.

In addition, the testimony of Employer's witnesses confirmed the documentary evidence that Employer accepted Claimant's injury as work-related and in response thereto continued his full salary.

gation to pay Claimant's benefits thereafter.

Section 413(a) of the Act indeed authorizes a WCJ to suspend or terminate an NCP

> **upon petition filed by either party with the department,** upon proof that the disability of an injured employe has ... decreased ..., or has temporarily or finally ceased.... Such ... suspension, or termination shall be made as of the date upon which it is shown that the disability of the injured employe has increased ... [or] recurred....

77 P.S. § 772 (emphasis added). Although suspensions and/or terminations are generally reviewed after an employer files a petition, this Court has held:

> [A] WCJ has authority to suspend/terminate a claimant's benefits in the absence of a formal petition where doing so would not be prejudicial to the claimant, *i.e.,* the claimant is put on notice that a suspension/termination is possible and is given the opportunity to defend against it. Whether the claimant has adequate notice depends on the totality of the circumstances of a particular case. This includes the procedural history, the factual history, the nature of the claimant's petition, and the nature of the employer's response to the claimant's petition.

*Krushauskas v. Workers' Comp. Appeal Bd. (Gen. Motors),* 56 A.3d 64, 71 (Pa. Cmwlth.2012).

██ Here, Claimant initiated the suspension of his salary continuation when he voluntarily terminated his employment. In Employer's answer to Claimant's Reinstatement Petition, it denied that Claimant's disability (i.e., wage loss) at that time was due to his work injury. Thereafter, at the hearings, Employer presented testimony from Claimant's direct supervisor Debbie Demko (Demko), Ms. Lex and Mr. Henehan that Claimant voluntarily resigned from his employment despite his ability to perform his modified job and, therefore, he was no longer entitled to salary continuation. Employer also cross-examined Claimant about why he stopped working. Based on the evidence, the WCJ concluded: "The Claimant has not met his burden of proving that his work-related disability worsened to the point that he could not perform the specially[-]created, modified job when he left work, **and benefits remain suspended.**" WCJ Dec. at 14 (emphasis added). "Because strictness of pleadings is not required in workers' compensation cases, and in the interest of judicial economy, the WCJ [is] empowered to take appropriate action based on the evidence presented." *Krushauskas,* 56 A.3d at 72. Accordingly, the WCJ properly suspended Claimant's benefits without a formal petition. Thus, the WCJ and the Board correctly refused to find that Employer had a continuing obligation to pay Claimant's benefits even though Employer did not file a petition to suspend benefits after Claimant quit in April 2009.

██ Claimant next contends that substantial evidence does not support the WCJ's finding that Claimant did not experience a worsening of his condition. At the April 13, 2010 hearing, Claimant testified that his job as a corrugated box designer required him to make boxes for customers' products. The job also required him to carry large pieces of cardboard, weighing up to 50 pounds, up and down the steps to and from his work area. He would then design, cut and glue samples for customers, dispose of scraps, provide customer service, relay specifications to plant managers, check work in the plant, and take packaging to the shipping dock. He stood for up to 7 hours of an 11-hour shift, and had to go up and down the steps to his work area 10 or 11 times a day. Claimant's work required him to lift

items from the floor to his waist level, grab things from over his head, and to kneel and squat to work on the floor when packaging was too big to create on his cutting table.

After Claimant's work injury, he did not perform his job, but was paid his salary. Claimant maintains that when he returned to work after his injury, he was restricted to work just a few hours per day, and he could not drive or lift anything. Thus, he would perform his design responsibilities and instruct salespeople assigned to help him on how to use the machines. Claimant admitted that, for "quite a while," perhaps "a few months," Employer provided Claimant with rides to and from work, and co-workers would walk up and down the steps with him at work because the metal steps to his workspace did not have a railing. Notes of Testimony, April 13, 2010 (N.T. 4/13/10) at 29–30.

Claimant averred that he stopped working in April 2009 because he "couldn't do the job any longer." N.T. 4/13/10 at 18. He contended that other employees were helping him but, at some point, he "wasn't getting any help from ... people," the work was piling up and customers were calling. N.T. 4/13/10 at 19. He claimed that Employer failed to abide by the number of hours he was permitted to work. Claimant asserted that the work exceeded his initial 4–hour workday restriction, then his modified 5–hour workday restriction and then his eventual 7–hour workday, explaining: "The work had to be don[e], and there was no other way to do it." Notes of Testimony, August 12, 2010 (N.T. 8/12/10) at 20. He described that Employer told him that "the work has to be done, the work has to be done .... it was just a constant fight back and forth." N.T. 4/13/10 at 31. He claims he was expected to work longer hours, and he was going in on Saturdays to try to get things done.

Claimant also contends that he told Ms. Demko before he resigned that he "couldn't do those job duties." N.T. 4/13/10 at 20; *see also* N.T. 4/13/10 at 30.

Claimant testified that, "[i]t's not the pressure of the job that made me leave. It's that I could not perform the job physically that made me leave." N.T. 4/13/10 at 32. He expressly recounted:

> I could not package up the boxes and send them downstairs. I could not go on my knees to glue things that had to be done. So most sample[s] didn't get done, or big boxes that had to be double-glued.... I was having a hard time with some of the sheets of balancing them and walking.

N.T. 4/13/10 at 32. Claimant further recalled that in order to safely carry pieces, he would have to crease them. Sometimes the creases ruined the sheets, and he would have to go back and replace them. Claimant concluded that there is no kind of work he could do in his field because he needs a job where he primarily sits, with limited walking and lifting. *See* N.T. 4/13/10 at 37–39.

Claimant testified that since he quit in April 2009, he has experienced weakness in his knee. He can stand for only about an hour at a time. He can lift approximately 20 pounds. He goes up and down his stairs at home only once or twice per day. He has trouble getting up from the ground. Claimant treated with orthopedic surgeon, Todd E. Chertow, M.D. (Dr. Chertow), from the time of his accident until August 2009. When Dr. Chertow left the area, Claimant treated with Thomas J. Allardyce, M.D. (Dr. Allardyce). In November 2009, Claimant began treating with physiatrist John A. Kline, Jr., M.D. (Dr. Kline). At the time of the April 13, 2010 hearing, Claimant was waiting for approval from Employer's insurance carrier to see an orthopedic surgeon in Phila-

delphia because his "knee surgery went horrible," and he wanted to look into perhaps another surgery. N.T. 4/13/10 at 25; *see also* R.R. at 42a. He testified that he wears a brace to keep his leg from collapsing. Dr. Kline prescribed Celebrex and Vicodin which Claimant takes on an as-needed basis.

At his August 12, 2010 deposition, Claimant testified that his job for Employer demanded him to bend, lift, twist, squat and kneel throughout the day. He stated that he was also required to stand more than half the day—5 or 6 hours. He claimed that, even with Employer's accommodations, he was not able to perform the essential functions of his design job, which is why he left. Claimant reported that Ms. Demko criticized him for not getting his tasks done. He explained:

> Oh, it was bad. Throughout the whole thing, I tried to tell her I can't keep up the same pace I did before. And there was a lot of arguing the last month or two, a lot of arguing. And I tried to explain to her over and over again, and she just kept on saying, it's going to get better.... I said, ... it's not getting better.

R.R. at 42a. He alleged that Ms. Demko told him to "go get better quicker...." R.R. at 49a. Claimant admitted that when he emailed Mr. Henehan that he was resigning, he merely indicated that he was not making progress in therapy, he was feeling pain in his knee while working, and he wanted to rest it. He does not recall whether he told Mr. Henehan that Ms. Demko was making him exceed his restrictions. He acknowledged, however, that his pay was never docked, he was not disciplined for not completing his modified work, and Employer did not fire him or threaten to fire him.

Claimant also presented testimony from Dr. Kline who reported that during his first examination Claimant could not fully straighten his right leg, and he had substantial atrophy in his right thigh as a result of his significant muscular trauma, which caused Claimant's inability to kneel and squat, go up and down steps, and walk without his knee buckling. Records provided to Dr. Kline by Claimant and his counsel confirmed Dr. Kline's opinions. Dr. Kline also saw Claimant in January 2010, at which time Claimant reported persistent and ongoing right knee pain and difficulty with weight-bearing and mobility. Dr. Kline's examination revealed that Claimant had continued right quadriceps weakness. He recommended that Claimant do resistance exercises to improve his right quadriceps strength with taping to alleviate discomfort in his kneecap. He prescribed an anti-inflammatory gel along with Celebrex and Vicodin, and continued use of a knee brace.

Dr. Kline opined that, based upon an 8-hour day, Claimant "is probably limited to a light-modified duty level work or lifting and carrying up to a maximum of 20 pounds. I limited his standing and walking from zero to two hours. I indicat[ed] that he couldn't climb or squat and twist the knee and kneel," which is consistent with restrictions in place since he recovered from surgery. R.R. at 25a. Dr. Kline added that he also limited Claimant to only occasional bending, reaching and rotating. He stated that Claimant would not be capable of working in any position that would require physical activity beyond those restrictions. Dr. Kline described Claimant's diagnosis as "somewhat poor ... given the longevity of time which transpired since the onset of injury." R.R. at 27a.

Employer presented the testimony of Ms. Demko, Ms. Lex, Mr. Henehan, Dr. Chertow and Dr. Allardyce. Ms. Demko testified that, except for Claimant's ongo-

ing difficulty organizing and prioritizing his work in Employer's fast-paced environment, Claimant was "a very good designer, very capable of doing creative design work and sampling and working with the computer." R.R. at 83a. She described that Claimant initially returned to work 4–hour days, and he had to be seated. After some time, his work time increased to 5 hours, and then ultimately to 7 hours a day before he resigned. Ms. Demko stated that when Ms. Lex notified her of Claimant's restrictions, she accommodated them. She described that Employer provided Claimant a special chair to help keep his leg extended. Employer also installed railings on the stairs, and had other employees spot Claimant as he went up and down the stairs. Ms. Demko recalled that Claimant could travel the stairs even with the brace on his leg.

Ms. Demko said Claimant notified her in person near the end of March 2009 "that he was quitting because he wanted to focus on his health." R.R. at 88a–89a. He did not tell her he was unable to physically do his job. She believed that she probably discussed Claimant's concerns about getting his job done when she discussed the importance of Claimant prioritizing his work. She declared that if Claimant had told her he could not physically do the job, she would have discussed with Ms. Lex and Employer's general manager what they could do to accommodate him. When asked if she required Claimant to work outside his physical restrictions or work more hours than he was released to perform, Ms. Demko replied: "Absolutely not." R.R. at 90a–91a. She acknowledged that Claimant was expected to do his job, and Employer was trying to accommodate him as best it could.

Ms. Lex confirmed that, except for some trouble prioritizing his work, Claimant was a good structural designer. When he was

hurt at work, Employer continued to pay his salary. She testified that when Claimant returned to work he could only work 4–hour days and he could not drive. Employer arranged for Claimant to be transported to and from work. He was also given a high chair so he could sit and not bend his leg. Ms. Lex explained that Employer arranged for employees to walk up and down the stairs with Claimant to make sure he was safe, they would carry corrugated sheets to him, and they would take inquiries to him so he did not have to walk to them. She recalled that Claimant was able to get upstairs to his office with his brace on. There was some discussion about moving Claimant's work area to the first floor, but because his table was upstairs, it was easier for him to work upstairs. Ms. Lex stated that, on December 1, 2008, Claimant was released to a 5–hour workday, but was still sedentary and unable to drive. His doctor gave him permission to work 5½ hours per day on December 4, 2008. Claimant was released as of March 1, 2009 to work 7 hours per day and drive. Ms. Lex maintained that Employer accommodated all of Claimant's restrictions until he resigned.

Claimant told Ms. Lex that he was resigning "[t]o focus on recovery of his knee." R.R. at 121a. She claims that he did not express any concern about his physical ability to perform his job. Although he mentioned to Ms. Lex that he felt Ms. Demko gave him too much work, he did not tell her that Ms. Demko was making him work more than his restricted hours. Claimant did not request additional accommodations or ask that his work area be relocated. Ms. Lex recalled many conversations Ms. Demko had with Claimant before and after his injury about prioritizing his work, but she does not recall Claimant ever being disciplined for not getting his work done. She agreed that, regardless of his restrictions, Employer

would expect Claimant to complete his job duties effectively. Ms. Lex testified that she reviewed a job analysis created for Claimant on November 6, 2008 by Employer's insurance company's nurse case manager Janet Dennis (Ms. Dennis). She acknowledged that the form reflected that Claimant's job could not be permanently modified. Ms. Lex stated that, had Claimant not resigned, Employer would have continued to pay him his salary, accommodate even light-duty restrictions, as well as move his workspace to the first floor.

Mr. Henehan testified that he reviewed Claimant's job restrictions before Claimant returned to work. He stated that when Claimant returned to work there was some discussion about moving his workspace to the first floor, but Claimant told them it was not necessary because he could walk the steps with his brace on. Although he was familiar with what physical abilities Claimant's job required, Mr. Henehan could not say specifically what percentage of Claimant's responsibilities demanded Claimant to bend and such. He recalled that, in March 2009, Ms. Lex notified him that Claimant "was resigning his position to focus on his therapy and [the] healing of his knee." R.R. at 293a. A short time later, he spoke to Claimant who told him "he was resigning and that he needed to rest his knee...." R.R. at 294a. He explained that Claimant sent him an email in which he stated, in pertinent part: "When speaking to you on your call [sic], I expressed my concerns over leaving the company with [r]egards to my knee injury. Currently, I am not making much progress with therapy and I am feeling [p]ain in my knee while working. I need to rest my knee." Notes of Claimant Testimony, August 12, 2010 (N.T. 8/12/10), Ex. D–1.

According to Mr. Henehan, although he was aware that Ms. Demko was critical of Claimant's prioritizing skills even before his injury, Claimant did not give him any indication that individuals at the local plant were making him work outside his physical restrictions or over his restricted hours. He reported that Claimant did not request any additional accommodations. If he had, Mr. Henehan stated he would have evaluated the feasibility of such requests because "[e]ven with his priority problems, he's a very talented designer," and "[w]e were anxious to have [Claimant] continue to work for us." R.R. at 296a, 308a.

Dr. Chertow first saw Claimant on October 13, 2008 due to complaints that he had acute knee pain and difficulty straightening his leg since he fell at work a few days previously. Dr. Chertow testified that, following his examination, he diagnosed Claimant with a complete patellar tendon tear. Dr. Chertow immediately admitted Claimant to the hospital, and surgically repaired Claimant's tendon the next day. Dr. Chertow had Claimant wear a brace to keep his leg straight for six weeks to allow the tendon to re-attach to the knee, and he instructed Claimant to bear weight on his knee as he could tolerate. Before Claimant left the hospital, he began aggressive physical therapy. Due to the straight leg brace, Claimant was restricted from driving.

Dr. Chertow testified that he saw Claimant again on November 6, 2008. At that time, Claimant had been undergoing physical therapy three times a week. Dr. Chertow described that, although Claimant was having trouble getting around due to his size, he was gradually putting weight on his knee and his recovery was on track. Dr. Chertow reported that he allowed Claimant to return to sedentary work wearing his brace and bearing weight on his knee as tolerated. Dr. Chertow completed a work restriction report for Claimant.

Dr. Chertow next saw Claimant on December 4, 2008, at which time Claimant was still wearing his brace, but had been undergoing physical therapy. He stated that Claimant reported "feeling much better," and "[r]eally had no complaints at that time." R.R. at 164a. Dr. Chertow's examination reflected that Claimant's surgical incision was almost completely healed. Claimant's knee was stiff, but that was a normal result of wearing a brace for over six weeks. Dr. Chertow described that he loosened Claimant's brace to afford him approximately 30 degrees of motion. He prescribed Claimant to continue physical therapy as well as water therapy given his weight. Dr. Chertow instructed the physical therapist to increase Claimant's knee brace range of motion each week. Claimant's driving and work restrictions remained in place. According to Dr. Chertow, the reason Claimant's work hours were limited was because he needed time to attend physical therapy.

Dr. Chertow examined Claimant again on January 15, 2009. He was still wearing his brace, but was gradually unlocking it 10 degrees per week. Claimant complained that his knee was freezing up and he had some clicking when walking and increased pain upon bending. He was still attending physical therapy, and was working 5½ hours per day. Claimant told him that his knee pain increased when he worked longer hours on days he did not attend physical therapy. Upon examination, Dr. Chertow found that Claimant "was improving," and his range of flexion had increased. R.R. at 167a. Dr. Chertow recommended that Claimant continue physical therapy and his restrictions. He reported that he did not place any restrictions on Claimant's use of stairs.

Dr. Chertow testified that, by the time of his February 26, 2009 examination, Claimant was using a cane and "feeling a lot better." R.R. at 169a. His range of motion was nearly normal, but he still had quadriceps weakness. Dr. Chertow discontinued Claimant's water therapy in lieu of only land therapy, and changed his work status to modified duty, whereby he could lift, carry, push and pull 25 to 50 pounds, but did not limit his ability to squat or stand. Dr. Chertow restricted Claimant's work hours to 7 hours per shift because "he still needed to get his physical therapy in." R.R. at 170a.

Dr. Chertow reported that, on March 19, 2009, Claimant still used his cane, was continuing physical therapy, and had been driving, but Claimant felt he had not made any progress since February. Dr. Chertow recommended he continue to work on gaining full strength in his quadricep, and maintained Claimant's restrictions. On April 30, 2009, Claimant informed Dr. Chertow that he had quit his job. Dr. Chertow testified that Claimant told him that although there had been improvement, his knee buckles at times and bends backwards, so Claimant requested an MRI to re-evaluate his knee. Dr. Chertow's findings were essentially the same as the prior examination, and his recommendations remained the same. He did, however, give Claimant a new brace to increase his feeling of stability because Claimant "was very fixated on his problem and was having trouble mentally overcoming his injury . . . ." R.R. at 181a. Dr. Chertow testified that Claimant expressed frustration with his job and that he had not yet fully recovered.

At his June 11, 2009 examination, Claimant told Dr. Chertow he thought he was doing better, and therapy increased his strength. Dr. Chertow found Claimant's quadriceps were better than before. He continued Claimant's restrictions. At his July 23, 2009 visit, Claimant told Dr. Chertow he was attending a work hardening

program 5 days per week, which caused him some increased pain, but he thought it was making him stronger, although he still had difficulty holding a squat. Claimant requested more pain medication. Dr. Chertow found Claimant had improved since his last visit, especially in his quadriceps strength. He recommended Claimant for a functional capacities evaluation (FCE).

Claimant last treated with Dr. Chertow on August 10, 2009. Since the time of Claimant's last visit, he had his FCE and had undergone an independent medical examination and an MRI. The FCE reflected a 68% out of a 100% validity rating,[7] which "made it difficult to interpret." R.R. at 189a. The FCE nevertheless put Claimant's abilities at light-duty. The MRI showed Claimant's right knee tendon was intact and in place. Dr. Chertow's examination revealed that Claimant had more weakness in his quadriceps and poorer range of motion and extension than he had previously. Dr. Chertow recommended a new physical therapist who may have different exercises with better results for quadriceps strengthening. He attributed Claimant's quadriceps weakness to lack of use and inadequate strengthening. Dr. Chertow released Claimant to light-duty. He did not restrict Claimant's ability to drive, stand, walk or squat. Dr. Chertow testified that he did not think Claimant's light-duty restriction was permanent. Rather, he felt Claimant needed more time for strength training to get past that restriction.

Dr. Allardyce conducted Claimant's independent medical examinations on August 6, 2009 and April 15, 2010. Before Claimant's first visit, Dr. Allardyce reviewed Claimant's diagnostic studies and August 5, 2009 FCE. Dr. Allardyce report-ed that at the August 6, 2009 examination Claimant was wearing a brace and, although it was hinged, he walked stiff-legged. Claimant could not completely straighten his right leg, and he showed right quadriceps atrophy. Claimant also had some crepitation in the right kneecap joint. Dr. Allardyce diagnosed Claimant with a right patella tendon rupture, with either a recurrent tear or a quad shutdown (atrophy from lack of use). Dr. Allardyce stated that for such diagnosis he prescribed active quadriceps strengthening rehabilitation. Dr. Allardyce testified that Claimant "could go back to work, and since the FCE put him at light duty, I thought that light duty was appropriate." R.R. at 230a.

Prior to Claimant's April 15, 2010 visit, Dr. Allardyce was provided and he reviewed copies of Claimant's medical records. At that visit, Claimant complained of some knee pain, but mostly weakness. Claimant told him that he used a knee brace when walking outside, but he otherwise could walk without a cane, and stand, sit and drive. Dr. Allardyce also noted that Claimant was working with the insurance company about getting a second opinion from a Philadelphia surgeon. Claimant still walked with his knee locked. His examination revealed that Claimant had only slightly improved right quadriceps atrophy.

Dr. Allardyce's evaluations led him to conclude that Claimant "was capable of working" full-time. R.R. at 237a. He described that Claimant could go up the stairs to the second story of Employer's plant and otherwise climb stairs as a normal activity of daily living because that is a good way to strengthen his quadriceps, "but not in a repetitive, industrial or com-

---

7. The validity rating reflects whether the persons being examined are "truly giving their all or they may be ... not trying as hard as they possibly can." R.R. at 189a.

mercial setting where he's doing it over and over and over," as such activity would be counterproductive. R.R. at 237a. Dr. Allardyce stated that he would not limit Claimant's ability to lift, twist, stand, sit or walk. He would restrict Claimant from deep knee squatting due to his atrophy, but indicated that he would lift that restriction when Claimant regained right quadriceps strength. Although the FCE reflected that Claimant should not kneel, twist, squat, bend, or climb, the 68% validity rating caused Dr. Allardyce to view it skeptically. He testified, however, that he would follow the light-duty recommendation therein. Dr. Allardyce also recommended that Claimant continue to pursue an appointment with the Philadelphia surgeon.

 "The WCJ . . . is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa.Cmwlth.2000). Thus, neither the Board nor the Court may reweigh the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 565 Pa. 114, 771 A.2d 1246 (2001). In addition, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. Unless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal." *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa.Cmwlth.2006) (citation omitted).

Here, the WCJ accepted as credible Claimant's testimony that he suffered an injury at work, and that the injury required restrictions and accommodations as specified by Dr. Chertow. The WCJ deemed credible the testimony that Claimant was a valued employee, and that Employer accommodated Claimant's injury. Because Claimant never specifically complained to Employer that his work duties were beyond his restrictions, and medical testimony failed to substantiate Claimant's assertion that further rehabilitation beyond quadriceps strengthening was required at the time he resigned, the WCJ rejected as unpersuasive Claimant's testimony that his injury worsened and that he was unable to work as of April 4, 2009. The WCJ also found that, in contrast to Dr. Chertow's and Dr. Allardyce's testimony, Dr. Kline's testimony lacked credibility as to Claimant's capabilities because he saw Claimant only twice, the first time being more than one year after Claimant's injury.

The WCJ specifically found that because Dr. Chertow was Claimant's treating physician immediately following his injury, and his opinions were based on multiple examinations, his opinions were "entitled to the greatest weight," and his testimony was "credible and persuasive, and accepted as fact." WCJ FOF ¶ 10. The WCJ similarly found Dr. Allardyce's testimony, which was based on objective tests and multiple examinations, and was supported by Dr. Chertow's testimony, "credible and persuasive, and accepted as fact." WCJ FOF ¶ 11. Further, the WCJ found the unchallenged testimony of Ms. Demko, which was supported by Ms. Lex's and Mr. Henehan's testimony, demonstrated Employer's extraordinary efforts to accommodate Claimant's work restrictions. The WCJ found Ms. Lex's and Mr. Henehan's testimony credible and persuasive relative to Employer's accommodation of Claimant's work injury, and the reasons for Claimant's April 2009 resignation.

The WCJ expressly rejected the following evidence:

39. In the beginning of April 2009, [Claimant] found that he was not getting

any help, and was asked to perform duties outside of Dr. Chertow's restrictions.... [H]e told [Ms.] Demko[ ] that he could not do the work any longer.
40. He was not able to perform his restricted duty in April 2009, which caused him to leave work. The Claimant got a lot of criticism from Ms. Demko during that period for not keeping up with his workload. When he first returned, he had a lot of help with lifting and other work, but that diminished over time.
41. The Claimant continues to have pain and weakness in his knee. He has difficulty standing up from a squatting position. He is not able to kneel at all. He cannot lift more than [20] pounds, and finds it hard to use stairs. There is no railing on the stairs at work, and nothing to hold on to.
42. Dr. Kline opined that the Claimant is limited to light-modified duty, with a limit on lifting over [20] pounds, limits on walking and standing, squatting and kneeling.

WCJ Dec. at 39–42 (footnotes omitted).

The record reveals that there was substantial credible evidence to support the WCJ's conclusion that Claimant did not experience a worsening of his condition that Claimant alleged required him to resign. Claimant returned to work in November 2008 without a loss of earnings. Employer paid Claimant's salary until he quit in April 2009. Testimony from Ms. Demko and Mr. Henehan, together with Claimant's resignation email, makes clear that Claimant did not notify Employer that his work duties were beyond his capabilities, and that he resigned because he wanted to concentrate on his rehabilitation. There also was substantial credible evidence of Claimant's value to Employer, and of Employer's ongoing willingness to take whatever action was necessary to keep Claimant employed. Employer accommodated all of Claimant's physical limitations from the time he returned to work until the time he resigned.

Medical evidence similarly supported the WCJ's conclusion that Claimant's disability had not gotten worse. At the time of his resignation, Claimant was on modified duty, with no restrictions on his driving, lifting, twisting, standing, sitting or walking. He could also squat to a limited degree. While it was recommended that Claimant avoid repetitive stair climbing, some stair climbing was recommended to strengthen his quadriceps. Claimant could also push and pull 25 to 50 pounds, which allowed him to lift all of the corrugated products. The testimony was also clear that Claimant was only limited in his work hours to accommodate his physical therapy sessions. Although Claimant's doctors limited him to light-duty, neither Dr. Chertow nor Dr. Allardyce testified that his light-duty status was permanent, or that the light-duty designation meant that he could not perform his job.

Based upon its review of the record evidence and in light of the WCJ's role as factfinder, the Board "determine[d] no fundamental misapprehension or irrational flaw in the WCJ's credibility determinations" and, based upon the credible evidence, agreed that "Claimant did not meet his burden of showing that his earnings or earning capacity was adversely affected by his work-related injury." Board Op. at 9. Viewing the evidence in a light most favorable to Employer, as we must, and drawing all reasonable inferences which are deducible from the evidence the WCJ deemed credible, we hold that the Board did not err by concluding that the WCJ's finding that Claimant's loss of earnings was not due to his work injury was supported by substantial evidence.

 Claimant further avers that the WCJ's and the Board's finding that Claimant could perform available work as of April 2009 was not based on substantial evidence. "If the employer asserts that the claimant can perform some work within [his] medical restrictions, the employer bears the burden of proving that suitable employment is available." *Presby Homes & Servs. v. Workers' Comp. Appeal Bd. (Quiah)*, 982 A.2d 1261, 1264 (Pa.Cmwlth. 2009) (citation omitted).

> [A] position may be found to be actually available, or within the claimant's reach, only if it can be performed by the claimant, having regard to his physical restrictions and limitations, his age, his intellectual capacity, his education, his previous work experience, and other relevant considerations, such as his place of residence.

*Id.* at 1264–65 (quoting *Roth v. Workers' Comp. Appeal Bd. (Amore Mgmt. Co.)*, 727 A.2d 1185, 1187 (Pa.Cmwlth.1999)).

> When an employer refers a claimant to an available job within the claimant's medical restrictions, the referral must be 'tailored to the claimant's abilities . . . and be made in a good faith attempt to return the injured employee to productive employment, rather than a mere attempt to avoid paying compensation.' . . . We directed that to meet this burden, an employer needs to 'produce medical evidence describing the claimant's capabilities, and vocational evidence classifying the job, e.g., whether it is light work, sedentary work, etc., along with a basic description of the job in question.' . . . It is then up to a [WCJ] to determine whether the claimant can actually perform the job in question.

*Presby Homes*, 982 A.2d at 1266 (quoting *Gen. Elec. Co. v. Workers' Comp. Appeal Bd. (Myers)*, 578 Pa. 94, 104, 849 A.2d 1166, 1171–72 (2004)). Where, as here, the record is replete with evidence that Employer made a good faith effort to return Claimant to productive employment by creating a modified-duty job specifically tailored to Claimant's physical restrictions, and the WCJ expressly rejected the Claimant's testimony that the job exceeded his/her limitations, Employer has satisfied its burden that suitable employment was available. *Id.* Thus, the WCJ's and the Board's finding that Claimant could perform available work as of April 2009 was based on substantial evidence.

 Claimant next argues that the WCJ and the Board erred by failing to make a finding relative to the duration that the light-duty position offered to Claimant was available. This Court has held that a modified-duty job is temporary or of short duration "only when it will become unavailable on a date certain." *Presby Homes*, 982 A.2d at 1267. Ms. Lex testified that the job analysis reflected that Claimant's job could not be permanently modified. However, there was no record evidence that Employer intended to stop accommodating Claimant's restrictions at any point. Rather, the credible record evidence demonstrated to the contrary-Employer continued to accommodate Claimant's limitations and would have continued to do so if he had not resigned. There being no date certain upon which Claimant's modified job would no longer be available, the WCJ and the Board did not err by not making a finding that the light-duty job was available for a limited duration.

 Lastly, Claimant maintains that the WCJ and the Board erred by relying on a job description containing inadmissible hearsay. "[H]earsay is defined as a 'statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted.' Pa. R.E.

801(c)." *Yost v. Unemployment Comp. Bd. of Review,* 42 A.3d 1158, 1163 (Pa. Cmwlth.2012). "It has long been established in this Commonwealth that hearsay evidence, *properly objected to,* is not competent evidence to support a finding of the [Unemployment Compensation Board of Review (UCBR) ], whether or not corroborated by other evidence." *Myers v. Unemployment Comp. Bd. of Review,* 533 Pa. 373, 377, 625 A.2d 622, 625 (1993); *see also Walker v. Unemployment Comp. Bd. of Review,* 27 Pa.Cmwlth. 522, 367 A.2d 366 (1976). However, "[h]earsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of the [UCBR], [i]f it is corroborated by any competent evidence in the record...." *Walker,* 367 A.2d at 370. These rules of law apply with equal force to workers' compensation proceedings. *See Rox Coal Co. v. Workers' Comp. Appeal Bd. (Snizaski),* 570 Pa. 60, 807 A.2d 906 (2002); *Joyce v. Workmen's Comp. Appeal Bd. (Ogden/Allied Maint.),* 545 Pa. 135, 680 A.2d 855 (1996); *Guthrie v. Workers' Comp. Appeal Bd. (The Travelers' Club, Inc.),* 854 A.2d 653 (Pa.Cmwlth. 2004).

The WCJ's September 30, 2010 hearing was held for the express purpose of addressing the admissibility of various exhibits, including the November 2008 job analysis Ms. Dennis prepared. At that hearing, Claimant's counsel stated on the record:

> As far as the job description, ... that's been attached to the exhibits and even I referenced it in some testimony. I have no objection to that being entered into the record. It's unobjected to hearsay, and the Court will give it whatever weight it deserves. If that, you know, is acceptable, then that can be admitted into the record—and given what weight the Court thinks needs to be given.

Notes of Testimony, September 30, 2010 (N.T. 9/30/10) at 6. When the WCJ reminded Claimant's counsel that he had originally expressed a desire to object to its admission, stating: "You're just letting it go in now?" Claimant's counsel repeated: "It can go in and be given the weight that the Court deems appropriate, given the testimony that's been subjected in this case." N.T. 9/30/10 at 6–7.

The Board concluded that "the information contained in the job analysis is hearsay and is to be given its natural probative effect," however, the WCJ did not make "any findings of fact solely on the hearsay" contained therein. Board Op. at 11. The Board found:

> The WCJ summarized Claimant's testimony, with citations to the record, at [FOF] Nos. 16 through 23. At [FOF] No. 30, the WCJ's summary of Dr. Allardyce's testimony includes the doctor's opinion that as of April 15, 2010, Claimant was able to perform the duties of his job with [Employer] as per the job description.
>
> The WCJ rejected Claimant's testimony that he was unable to continue working after April 14, 2009, and accepted the testimony of [Employer's] fact witnesses as establishing that accommodations were made to bring Claimant's duties within his restrictions. The only reference to the job description is in connection with Dr. Allardyce's opinion that in August 2010, Claimant was able to perform the duties as described. We see no indication that Claimant's residual capacity as of August 2010 was considered by the WCJ in his conclusion that Claimant did not meet his burden of establishing disability as of April 2009, and determine no error.

Board Op. at 11. We agree with the Board's analysis and hold that the WCJ and the Board did not err by affording the

job description probative value under these circumstances.

Based on the foregoing, the Board's order is reversed in part and affirmed in part.

### ORDER

AND NOW, this 10th day of April, 2014, that part of the Workers' Compensation Appeal Board's June 11, 2013 order applying a Claim Petition burden of proof is reversed, and all remaining portions of the Board's order are affirmed.